____ ✓ FILED   ____ ENTERED
____ LOGGED   ____ RECEIVED
8:54 am, Feb 26 2021
AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____Deputy

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

IN THE MATTER OF THE SEARCH OF:

**TWENTY-THREE TARGET DEVICES IN THE UNITED STATES POSTAL INSPECTION SERVICE'S POSSESSION IN LINTHICUM HEIGHTS, MARYLAND OR HOMELAND SECURITY INVESTIGATIONS' POSSESSION IN FREDERICK, MARYLAND**

Misc. Case No. ___1:21-mj-356 TMD___

### AFFIDAVIT IN SUPPORT OF A SEARCH AND SEIZURE WARRANT

I, Derek L. Starliper, being duly sworn, depose and state the following:

### Introduction

1.       Your Affiant makes this affidavit in support of an application under Federal Rule of Criminal Procedure 41 for a search and seizure warrant authorizing the examination of twenty-two electronic devices and one electronic tablet, as fully described in Attachment A (collectively referred to as the "**TARGET DEVICES**"), and the extraction of electronically stored information identified in Attachment B from the **TARGET DEVICES**.

2.       Your Affiant submits that probable cause exists to believe that Carlyle Lavar Alvarez ("**C. ALVAREZ**"), Jennifer Jean Gann ("**GANN**"), Antoine Anthony Alvarez ("**A. ALVAREZ**"), Millie Anne Reyes ("**REYES**"), Ivan Augustus Ransome ("**RANSOME**"), and Maria Alvarez ("**M. ALVAREZ**") (collectively referred to as the "**TARGET SUBJECTS**") engaged in drug trafficking activities in violation of 21 U.S.C. § 846; and (ii) the **TARGET DEVICES** contain fruits and evidence of drug trafficking activities, in violation of 21 U.S.C. §§ 841(a)(1), 843(b), and 846.

**Affiant's Background**

3.      I am "an investigative or law enforcement officer . . . of the United States" within the meaning of 18 U.S.C. § 2510(7)—that is, an officer of the United States of America ("United States") who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

4.      I have been an Inspector with the United States Postal Inspection Service ("USPIS") since October 2018, where I am currently assigned to the Maryland Narcotics Team. Prior to my employment with USPIS, I was a Special Agent with the United States Attorney's Office for the District of Columbia, assigned to the Violent Crimes and Narcotics Trafficking Section, and a Police Officer with the Metropolitan Police Department (Washington, D.C.), assigned to the Narcotics and Special Investigations Division.

5.      Since 2007, as a law enforcement officer, I have participated in numerous drug trafficking investigations during which I have used the following investigative techniques: (1) interviewing informants and cooperating witnesses; (2) conducting physical surveillance; (3) supporting undercover operations; (4) consensual monitoring and recording of both telephonic and non-telephonic communications; (5) analyzing telephone pen register and caller identification system data; (6) conducting court-authorized electronic surveillance; and (7) preparing and executing search warrants that have led to substantial seizures of narcotics, firearms, and other contraband.  I have also applied for federal wire and electronic intercepts; listened to court-authorized intercepted calls between individuals involved or suspected to be involved in drug trafficking activities; reviewed court-authorized text message; and interpreted court-authorized intercepted calls and text messages.

6.      I have also received training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, and narcotics, white-collar, and various other crimes.

7.      In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of proceeds derived from the sale of narcotics, and the organization of drug conspiracies.  I have also become familiar with the ways in which narcotics traffickers use cellular telephones, cellular telephone technology, coded communications or slang during conversations, and other means to facilitate their illegal activities and thwart law enforcement investigations.

8.      Specifically, based on your Affiant's training, knowledge, and experience, your Affiant has learned the following:

     a.   Narcotics trafficking is an ongoing and recurring criminal activity. As contrasted with crimes against persons, which tend to be discrete offenses, narcotics trafficking is an illicit commercial activity that is characterized by regular, repeated criminal activity.

     b.   Narcotics traffickers commonly compartmentalize members of their organization into discrete "cells," with specific members, responsibilities, and/or geographical territories assigned to each cell, and members of one cell commonly receive information only about that specific cell's criminal activities.   Consequently, this limitation of information frustrates law enforcement efforts to dismantle the entire organization.

     c.   High-level narcotics traffickers commonly use multiple cellular telephones.

     d.   Cellular telephones are indispensable tools of the narcotics trafficking trade. Narcotics traffickers use cellular telephones, push-to-talk telephones, Short Message Service ("SMS"), electronic mail, and other, similar electronic means and/or devices to maintain contact with co-conspirators and other narcotics traffickers.

     e.   Narcotics traffickers commonly maintain books, records, receipts, notes, ledgers, bank records, money orders, and other papers relating to the importation, manufacture, transportation, ordering, sale, and distribution of narcotics.  Narcotics traffickers maintain the aforementioned enumerated

items where they have ready access to them, such as in secured locations within their residence, the residences of their friends, family members, and associates, or their drug distribution locations.  Due to the advancement in technology, narcotics traffickers may use cellular telephones to store those records.

f.   Narcotics traffickers usually take, or cause to be taken, photographs of themselves, their associates, their property, and illegal contraband.  Drug traffickers usually maintain these photographs where they can readily access them, such as their cellular telephones.

g.   Narcotics traffickers often use cellular telephones to maintain their co-conspirators' names and contact information, facilitate drug transactions, and run their drug distribution operations.

h.   Drug trafficking organizations utilize the United States mail as a means of transporting narcotics and proceeds thereof to and from drug trafficking organization ("DTO") members.  They use United States Priority Mail Express and Priority Mail services to ship narcotics and bulk-cash narcotics proceeds through the United States mail.  Each United States Priority Mail Express and Priority Mail parcel has a distinct tracking number, and an individual with a tracking number can track the particular parcel online.  Packages shipped to or from narcotics source states—such as Arizona, California, Texas, Washington, Colorado, and Florida—or territories—such as Puerto Rico—can signify that the United States Priority Mail Express and Priority Mail parcels contain narcotics or the proceeds thereof.

## Bases of Information

9.    The information contained in this affidavit is based upon my personal knowledge and observations as well as that of the other agents involved in this investigation.  Those agents, persons with knowledge of this investigation, related those observations to me.  Because I submit this affidavit for the limited purpose of establishing probable cause for the requested search warrant, I have not included every fact and matter observed by or made known to agents of the government.  Rather, I have set forth only those facts that I believe are necessary to establish probable cause.

**Probable Cause**

*Background Information*

10.     This is an Organized Crime Drug Enforcement Task Force investigation targeting narcotics traffickers in the several states, including Arizona, Maryland, New York, and Ohio.

11.     Based on the evidence gathered during the course of this investigation thus far, investigators believe that Carlyle Lavar Alvarez ("**C. ALVAREZ**") **DTO** supplies others with narcotics—including, but not limited to, wholesale quantities of fentanyl, disguised as Oxycodone pills—through the United States mail.  Among the **C. ALVAREZ DTO** members who have shipped or assisted with the shipment of suspected narcotics parcels to others through the United States mail include **A. ALVAREZ**, who is **C. ALVAREZ**'s brother; **GANN**, who is **C. ALVAREZ**'s significant other; **REYES**, who is believed to be **A. ALVAREZ**'s significant other; and **M. ALVAREZ**, who is **C. ALVAREZ** and **A. ALVAREZ**'s mother.

12.     Investigators have identified approximately eighty (80) suspicious Priority Mail Express and Priority Mail parcels mailed through the United States Postal Service ("USPS") from Arizona to addresses in other states between February 2020 and December 2020.  Investigators have seized several of those Priority Mail Express parcels, and the aggregate amount of pills containing fentanyl is approximately 5,161 pills, weighing approximately 562 grams.

13.     On October 22, 2020, the Court entered an Order authorizing, inter alia, the initial interception of wire and electronic communications occurring over the cellular telephone assigned call number (602) 551-4243 used by **C. ALVAREZ**; the initial interception of wire and electronic communications occurring over the cellular telephone assigned call number (480) 283-3767 used by **C. ALVAREZ** (hereinafter referred to as "**Target Telephone 2**"); and the initial interception

of wire and electronic communications occurring over the cellular telephone assigned call number (240) 707-9657 used by **RANSOME** (hereinafter referred to as "**Target Telephone 3**").

14.     On December 2, 2020, Judge Gallagher authorized, inter alia, the renewed interception of wire communications only occurring over **Target Telephone 2** (hereinafter referred to as the "Second Wiretap").

15.     Law enforcement has ceased interception communications occurring over the Initial Wiretap and the Second Wiretap.

16.     On December 19, 2020, at approximately 1:19 a.m. (EST), four days after investigators conducted the controlled delivery of narcotics parcels containing approximately 1 kilogram of cocaine each as part of this investigation, investigators stopped receiving pings from **Target Telephone 2**.  Likewise, as of December 18, 2020, there were no longer communications occurring over **Target Telephone 2**.  Based on investigators' training, knowledge, and experience, including their involvement in this investigation, investigators believe that **C. ALVAREZ** dropped **Target Telephone 2** after learning about the December 15, 2020 controlled delivery.

17.     On January 11, 2021, Honorable Thomas M. DiGirolamo, United States Magistrate Judge for the District of Maryland, issued criminal complaints and arrest warrants for **C. ALVAREZ**, **GANN**, **A. ALVAREZ**, **REYES**, and **RANSOME**.  Specifically, **C. ALVAREZ** was charged with conspiracy to distribute and possess with the intent to distribute fentanyl and cocaine, in violation of 21 U.S.C. § 846; **GANN** and **RANSOME** were charged with conspiracy to distribute and possess with the intent to distribute fentanyl, in violation of 21 U.S.C. § 846; and **A. ALVAREZ** and **REYES** were charged with conspiracy to distribute and possess with the intent to distribute fentanyl and cocaine, in violation of 21 U.S.C. § 846.

18.     On the same day, United States Magistrate Judge DiGirolamo issued a search and seizure warrant for **RANSOME**'s residence located 42 East Avenue, Apartment 1E, Hagerstown, Maryland 21740 ("**RANSOME's Residence**").  The affidavit submitted in support of that warrant is attached as Exhibit 1 and incorporated by reference.

19.     On January 12, 2021, Magistrate Judge Deborah M. Fine, United State Magistrate Judge for the District of Arizona, issued search and seizure warrants for three locations: (1) **C. ALVAREZ** and **GANN**'s residence located at 2321 N. 39th Avenue, Phoenix, Arizona 85009 ("**C. ALVAREZ and GANN's Residence**"); (2) **M. ALVAREZ**'s residence located at 2323 N. 39th Avenue, Phoenix, Arizona 85009 ("**M. ALVAREZ's Residence**"); and (3) **A. ALVAREZ** and **REYES**' residence located at 2325 N. 39th Avenue, Phoenix, Arizona 85009 ("**A. ALVAREZ and REYES' Residence**") (collectively referred to as the "**Arizona Target Locations**").  The affidavit submitted in support of that warrant is attached as Exhibit 2 and incorporated by reference.

20.     On January 14, 2021, investigators executed the January 12, 2021 search and seizure warrants on the **Arizona Target Locations**.  Among the items seized from **C. ALVAREZ** and **GANN's Residence** were **TARGET DEVICE 9** in the hallway closet; and **TARGET DEVICE 10**, **TARGET DEVICE 11**, **TARGET DEVICE 12**, **TARGET DEVICE 13**, **TARGET DEVICE 14**, **TARGET DEVICE 15**, **TARGET DEVICE 16**, **TARGET DEVICE 17**, **TARGET DEVICE 18**, **TARGET DEVICE 19**, and **TARGET DEVICE 20** in **C. ALVAREZ** and **GANN**'s bedroom; and **TARGET DEVICE 21** and **TARGET DEVICE 22** on the top shelf of the closet in **C. ALVAREZ** and **GANN**'s bedroom.  Based on investigators' training, knowledge, and experience, including their experience in this investigation, they believe that **TARGET DEVICE 9**, **TARGET DEVICE 10**, **TARGET DEVICE 11**, **TARGET**

**DEVICE 12**, **TARGET DEVICE 13**, **TARGET DEVICE 14**, **TARGET DEVICE 15**, **TARGET DEVICE 16**, **TARGET DEVICE 17**, **TARGET DEVICE 18**, **TARGET DEVICE 19**, **TARGET DEVICE 20**, **TARGET DEVICE 21**, and **TARGET DEVICE 22** (collectively the "**TARGET DEVICES seized from Arizona Target Location 1**") belong to either **C. ALVAREZ** or **GANN**, because the **TARGET DEVICES seized from Arizona Target Location 1** were seized from **C. ALVAREZ** and **GANN**'s bedroom and hallway closet.

21.     Among the items seized from **M. ALVAREZ's Residence** were **TARGET DEVICE 4** in the closet of **M. ALVAREZ**'s bedroom; and **TARGET DEVICE 5**, **TARGET DEVICE 6**, **TARGET DEVICE 7**, and **TARGET DEVICE 8** inside of the hallway closet.  **M. ALVAREZ** lives at **M. ALVAREZ's Residence** alone.   Based on investigators' training, knowledge, and experience, including their experience in this investigation, they believe that **TARGET DEVICE 4**, **TARGET DEVICE 5**, **TARGET DEVICE 6**, **TARGET DEVICE 7**, **TARGET DEVICE 8** (collectively the "**TARGET DEVICES seized from Arizona Target Location 2**") belong to **M. ALVAREZ**, because the **TARGET DEVICES seized from Arizona Target Location 2** were seized from **M. ALVAREZ's Residence** in which **M. ALVAREZ** lives alone.

22.     Among the items seized from **A. ALVAREZ and REYES' Residence** were **TARGET DEVICE 1**, **TARGET DEVICE 2**, and **TARGET DEVICE 3** in **A. ALVAREZ** and **REYES'** bedroom.  Based on investigators' training, knowledge, and experience, including their experience in this investigation, they believe that **TARGET DEVICE 1**, **TARGET DEVICE 2**, and **TARGET DEVICE 3** (collectively the "**TARGET DEVICES seized from Arizona Target Location 3**") belong to either **A. ALVAREZ** or **REYES**, because the **TARGET DEVICES seized from Arizona Target Location 3** were seized from **A. ALVAREZ** and **REYES'** bedroom.

23.     On January 14, 2021, HSI Maryland investigators executed the January 11, 2021 search and seizure warrant at **RANSOME's Residence**.   Among the items seized from **RANSOME's Residence** was **TARGET DEVICE 23**—which investigators confirmed as **Target Telephone 3**—in the second bedroom.  HSI Maryland investigators have maintained **TARGET DEVICE 23** in the same condition as when HSI Maryland investigators seized **TARGET DEVICE 23** from **RANSOME's Residence**.

24.     The seizing agents assigned to the **Arizona Target Locations** transferred custody of the **TARGET DEVICES seized from Arizona Target Location 1**, the **TARGET DEVICES seized from Arizona Target Location 2**, and the **TARGET DEVICES seized from Arizona Target Location 3** to an Arizona Postal Inspector.  The Arizona Postal Inspector, using the USPS Priority Mail Express service, shipped the **TARGET DEVICES seized from Arizona Target Location 1**, the **TARGET DEVICES seized from Arizona Target Location 2**, and the **TARGET DEVICES seized from Arizona Target Location 3** to the Affiant in the Linthicum Heights on January 25, 2021.  Your Affiant received the **TARGET DEVICES seized from Arizona Target Location 1**, the **TARGET DEVICES seized from Arizona Target Location 2**, and the **TARGET DEVICES seized from Arizona Target Location 3** on January 28, 2021. USPIS Postal Inspectors have maintained the **TARGET DEVICES seized from Arizona Target Location 1**, the **TARGET DEVICES seized from Arizona Target Location 2**, and the **TARGET DEVICES seized from Arizona Target Location 3** in the same condition as when the seizing agents seized the **TARGET DEVICES seized from Arizona Target Location 1**, the **TARGET DEVICES seized from Arizona Target Location 2**, and the **TARGET DEVICES seized from Arizona Target Location 3**.

**Technical Terms**

25.     Based on my training and experience, your Affiant uses the following technical

terms to convey the following meanings:

    a.    *Wireless telephone*:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include:  storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include Global Positioning System ("GPS") technology for determining the location of the device.

    b.    *Digital camera*:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media includes various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

    c.    *Portable media player*:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media includes various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

    d.    *GPS*:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records of the locations where

it has been.   Some GPS navigation devices can give a user driving or walking directions to another location.   These devices can contain records of the addresses or locations involved in such navigation.   The Global Positioning System consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock.   Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.   These signals are sent by radio, using specifications that are publicly available.   A GPS antenna on Earth can receive those signals.   When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      *PDA*:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs.   Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.   PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.   Removable storage media includes various types of flash memory cards or miniature hard drives.   This removable storage media can store any digital data.   Most PDAs run computer software, giving them many of the same capabilities as personal computers.   For example, PDA users can work with word-processing documents, spreadsheets, and presentations.   PDAs may also include GPS technology for determining the location of the device.

f.      *IP Address*:  An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.   An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).   Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.   Most Internet service providers control a range of IP addresses.   Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.      *Internet*:  The Internet is a global network of computers and other electronic devices that communicate with each other.   Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

Based on your Affiant's training, experience, and research, he knows that the **TARGET DEVICES** have capabilities that allow them to serve as a wireless telephone, digital camera,

portable media player, GPS navigation device, and PDA, with the capability to access the Internet. In your Affiant's training and experience, examining data stored on a device of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

### Electronic Storage and Forensic Analysis

26.     Based on your Affiant's knowledge, training, and experience, he knows that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on such devices.  This information can sometimes be recovered with forensics tools.

27.     *Forensic evidence*.  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **TARGET DEVICES** were used, the purpose of their use, who used them, and when they were used.  There is probable cause to believe that such forensic electronic evidence might be on the **TARGET DEVICES** because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.      Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when were they used.

d.      The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data

stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when it was used, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

28.  *Nature of examination*. Based on the foregoing, and consistent with Federal Rule of Criminal Procedure 41(e)(2)(B), the warrant for which the Affiant is applying would permit the examination of the **TARGET DEVICES** consistent with the warrant. The examination may require authorities to employ techniques, including, but not limited to, computer-assisted scans of the entire medium that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

29.  *Manner of execution*. Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, your Affiant submits that there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

30.  *Search and review protocol*: With respect to the search of the information provided pursuant to the requested warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the requested warrant while minimizing the review of information not within the list of items to be seized as set forth in Attachment B, to the extent reasonably practicable. If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review. The investigative

13

team will take no further steps regarding any review of information so segregated absent further order of the court.   The investigative team may continue to review any information not segregated as potentially privileged.

### <u>Conclusion</u>

31.     Based on the foregoing, your Affiant respectfully submits that there is probable cause to believe that the **TARGET SUBJECTS** engaged in drug trafficking activities in violation of 21 U.S.C. § 846; and (ii) a search of the **TARGET DEVICES**, in accord with Attachment B, will uncover evidence and fruits of drug trafficking activities, in violation of 21 U.S.C. §§ 841(a)(1), 843(b), and 846.

Respectfully submitted,

*Derek Starliper*
Derek Starliper, Inspector
U.S. Postal Inspection Service

Affidavit submitted by e-mail and attested to me as accurate by telephone consistent with Fed. R. Crim. Proc. 4.1 and 41(d)(3) this _10_ day of February, 2021

Honorable Thomas M. DiGirolamo
United States Magistrate Judge

## Attachment A:  TARGET DEVICES

The property to be searched is described as follows:

| ITEM | DESCRIPTION | SEIZURE LOCATION |
|---|---|---|
| **TARGET DEVICE 1** | Purple Samsung Galaxy S9 cellphone (unknown s/n) with a brown protective case | **A. ALVAREZ** and **REYES**' bedroom of 2325 N. 39th Avenue, Phoenix, Arizona 85009 ("**A. ALVAREZ and REYES**' Residence") |
| **TARGET DEVICE 2** | Product Red Apple iPhone cellphone (unknown s/n) with a game console protective case | **A. ALVAREZ** and **REYES**' bedroom of **A. ALVAREZ and REYES**' Residence |
| **TARGET DEVICE 3** | White Apple iPhone (unknown s/n) | **A. ALVAREZ** and **REYES**' bedroom of **A. ALVAREZ and REYES**' Residence |
| **TARGET DEVICE 4** | Black Samsung cellphone (unknown s/n) | closet of **M. ALVAREZ**'s bedroom of 2323 N. 39th Avenue, Phoenix, Arizona 85009 ("**M. ALVAREZ's Residence**") |
| **TARGET DEVICE 5** | Samsung cellphone (unknown s/n) | hallway closet of **M. ALVAREZ's Residence** |
| **TARGET DEVICE 6** | LG cellphone (unknown s/n) | hallway closet of **M. ALVAREZ's Residence** |
| **TARGET DEVICE 7** | White LG cellphone (unknown s/n) | hallway closet of **M. ALVAREZ's Residence** |
| **TARGET DEVICE 8** | Black tablet (unknown make/model and unknown s/n) | hallway closet of **M. ALVAREZ's Residence** |
| **TARGET DEVICE 9** | Black Apple iPhone (unknown s/n) | hallway closet in 2321 N. 39th Avenue, Phoenix, Arizona 85009 ("**C. ALVAREZ and GANN's Residence**") |
| **TARGET DEVICE 10** | Silver LG cellphone (unknown s/n) | **C. ALVAREZ** and **GANN**'s bedroom of  **C. ALVAREZ and GANN's Residence** |
| **TARGET DEVICE 11** | Black Samsung Galaxy S10 (IMEI: 352335100657547) in clear protective case with gold sparkles | **C. ALVAREZ** and **GANN**'s bedroom of **C. ALVAREZ and GANN's Residence** |
| **TARGET DEVICE 12** | Purple Apple iPhone in clear protective case | **C. ALVAREZ** and **GANN**'s bedroom of **C. ALVAREZ and GANN's Residence** |
| **TARGET DEVICE 13** | Silver LG G6 cellphone (IMEI 355468082912643) in smoke colored protective case | **C. ALVAREZ** and **GANN**'s bedroom of **C. ALVAREZ and GANN's Residence** |

| **TARGET DEVICE 14** | Silver LG cellphone with cracked screen (unknown s/n) | **C. ALVAREZ** and **GANN**'s bedroom of **C. ALVAREZ and GANN's Residence** |
|---|---|---|
| **TARGET DEVICE 15** | White Samsung cellphone (s/n 354335070681194) in gray and pink protective case | **C. ALVAREZ** and **GANN**'s bedroom of **C. ALVAREZ and GANN's Residence** |
| **TARGET DEVICE 16** | Product Red Apple iPhone (unknown s/n) in clear protective case | **C. ALVAREZ** and **GANN**'s bedroom of **C. ALVAREZ and GANN's Residence** |
| **TARGET DEVICE 17** | Black Motorola Droid with Verizon logo on back (unknown s/n) in gray and pink protective case | **C. ALVAREZ** and **GANN**'s bedroom of **C. ALVAREZ and GANN's Residence** |
| **TARGET DEVICE 18** | Black Maxwest flip cellphone (unknown s/n) | **C. ALVAREZ** and **GANN**'s bedroom of **C. ALVAREZ and GANN's Residence** |
| **TARGET DEVICE 19** | Product Red Apple iPhone (unknown s/n) in protective case with clear back | **C. ALVAREZ** and **GANN**'s bedroom of **C. ALVAREZ and GANN's Residence** |
| **TARGET DEVICE 20** | Black Samsung Galaxy S10 (IMEI 352335100659386, phone number 602-551-4243) in smoke colored protective case | **C. ALVAREZ** and **GANN**'s bedroom of **C. ALVAREZ and GANN's Residence** |
| **TARGET DEVICE 21** | Gray TCL cellphone (unknown s/n) | top shelf of **C. ALVAREZ** and **GANN**'s bedroom closet of **C. ALVAREZ and GANN's Residence** |
| **TARGET DEVICE 22** | Silver Alcatel cellphone (unknown s/n) | top shelf of **C. ALVAREZ** and **GANN**'s bedroom closet of **C. ALVAREZ and GANN's Residence** |
| **TARGET DEVICE 23** | Black Apple iPhone (phone number 240-707-9657 – TT-3) | second bedroom of 42 East Avenue, Apartment 1E, Hagerstown, Maryland, 21740 |

**TARGET DEVICE 1**, **TARGET DEVICE 2**, **TARGET DEVICE 3**, **TARGET DEVICE 4**, **TARGET DEVICE 5**, **TARGET DEVICE 6**, **TARGET DEVICE 7**, **TARGET DEVICE 8**, **TARGET DEVICE 9**, **TARGET DEVICE 10**, **TARGET DEVICE 11**, **TARGET DEVICE 12**, **TARGET DEVICE 13**, **TARGET DEVICE 14**, **TARGET DEVICE 15**, **TARGET DEVICE 16**, **TARGET DEVICE 17**, **TARGET DEVICE 18**, **TARGET DEVICE**

**19**, **TARGET DEVICE 20**, **TARGET DEVICE 21**, **TARGET DEVICE 22**, and **TARGET DEVICE 23** (collectively referred to as the "**TARGET DEVICES**") are in either the United States Postal Inspection Service's possession in Linthicum Heights, Maryland, or Homeland Security Investigations' in Frederick, Maryland.

## Attachment B: Items to Be Seized from the TARGET DEVICES

1.     This warrant authorizes the search and seizure of all records contained within the devices described in Attachment A that constitute evidence of violations of 21 U.S.C. §§ 841(a)(1), 843(b), and 846 by Carlyle Lavar Alvarez, Jennifer Jean Gann, Antoine Anthony Alvarez, Millie Anne Reyes, Ivan Augustus Ransome, Maria Alvarez, and their known and unknown co-conspirators, including, but not limited to, the following:

  a.  images;

  b.  videos;

  c.  records of incoming and outgoing voice communications;

  d.  records of incoming and outgoing text messages;

  e.  the content of incoming and outgoing text messages;

  f.  voicemails;

  g.  e-mails;

  h.  voice recordings;

  i.  contact lists;

  j.  data from third-party applications (including social media applications like Facebook and Instagram and messaging programs like WhatsApp and Snapchat);

  k.  location data;

  l.  bank records, checks, credit card bills, account information, and other financial records;

  m.  evidence of who used, owned, or controlled the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

  n.  evidence of software that would allow others to control the **TARGET DEVICES**, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

o.   evidence of the lack of such malicious software;

p.   evidence of the attachment to the **TARGET DEVICES** of other storage devices or similar containers for electronic evidence;

q.   evidence of counter forensic programs (and associated data) that are designed to eliminate data from the **TARGET DEVICES**;

r.   evidence of the times the **TARGET DEVICES** were used;

s.   passwords, encryption keys, and other access devices that may be necessary to access the **TARGET DEVICES**;

t.   documentation and manuals that may be necessary to access the **TARGET DEVICES** or to conduct a forensic examination of the **TARGET DEVICES**; and

u.   contextual information necessary to understand the evidence described in this attachment.

2.   The search procedure of the electronic data for the items described in Paragraph 1 may include the following techniques (the following is a non-exhaustive list, and the Government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting the Government examination of all the data necessary to determine whether the data falls within the items to be seized):

a.   surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

b.   "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

c.   "scanning" storage areas to discover and possible recover recently deleted files;

d.   "scanning" storage areas for deliberately hidden files; or

e.   performing key word or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

3.   If after performing these procedures, the directories, files, or storage areas do not reveal evidence of violations of 21 U.S.C. §§ 841(a)(1) and 846, the further search of that particular directory, file, or storage area shall cease.

4.   With respect to the search of the information provided pursuant to this warrant, law

enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable.   If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review.   The investigative team will take no further steps regarding any review of information so segregated absent further order of the court.   The investigative team may continue to review any information not segregated as potentially privileged.

# EXHIBIT 1

# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **IN THE MATTER OF THE:** | ) | **UNDER SEAL** |
| | ) | |
| **Criminal Complaint for Carlyle Lavar Alvarez,** | ) ) ) | **Misc. No.** 1:21-mj-057 TMD |
| | ) | |
| **Criminal Complaint for Jennifer Jean Gann,** | ) ) ) | **Misc. No.** 1:21-mj-058 TMD |
| | ) | |
| **Criminal Complaint for Antoine Anthony Alvarez,** | ) ) ) | **Misc. No.** 1:21-mj-059 TMD |
| | ) | |
| **Criminal Complaint for Millie Anne Reyes,** | ) ) ) | **Misc. No.** 1:21-mj-060 TMD |
| | ) | |
| **Criminal Complaint for Courtney Lavell Floyd, a/k/a Courtney Lavelle Floyd,** | ) ) ) ) | **Misc. No.** 1:21-mj-061 TMD |
| | ) | |
| **Criminal Complaint for Shanavia Middleton,** | ) ) ) | **Misc. No.** 1:21-mj-062 TMD |
| | ) | |
| **Criminal Complaint for Ivan Augustus Ransome, and** | ) ) ) | **Misc. No.** 1:21-mj-063 TMD |
| | ) | |
| **Search of 42 East Avenue, Apartment 1E, Hagerstown, Maryland 21740** | ) ) ) ) | **Misc. No.** 1:21-mj-064 TMD |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINTS, ARREST WARRANTS, AND A SEARCH AND SEIZURE WARRANT

I, Derek L. Starliper, being duly sworn, depose and state the following:

### Introduction

1.      I make this Affidavit in support of the following:

     a.   Criminal Complaint and arrest warrant for Carlyle Lavar Alvarez;

     b.   Criminal Complaint and arrest warrant for Jennifer Jean Gann;

     c.   Criminal Complaint and arrest warrant for Antoine Anthony Alvarez;

     d.   Criminal Complaint and arrest warrant for Millie Anne Reyes;

     e.   Criminal Complaint and arrest warrant for Courtney Lavell Floyd a/k/a Courtney Lavelle Floyd;

     f.   Criminal Complaint and arrest warrant for Shanavia Middleton;

     g.   Criminal Complaint and arrest warrant for Ivan Augustus Ransome; and

     h.   Search and seizure warrant for 42 East Avenue, Apartment 1E, Hagerstown, Maryland 21740, as fully described in Attachment A.

2.     I submit that probable cause exists to believe that Carlyle Lavar Alvarez ("**C. ALVAREZ**"), Jennifer Jean Gann ("**GANN**"), Antoine Anthony Alvarez ("**A. ALVAREZ**"), Millie Anne Reyes ("**REYES**"), Courtney Lavell Floyd a/k/a Courtney Lavelle Floyd ("**FLOYD**"), Shanavia Middleton ("**MIDDLETON**"), Ivan Augustus Ransome ("**RANSOME**") (collectively referred to as the "**Target Subjects**") are engaging in drug trafficking activities in violation of 21 U.S.C. § 846; and (ii) 42 East Avenue, Apartment IE, Hagerstown, Maryland 21740, as fully described in Attachment A, (hereinafter referred to as the "**Target Premises**") contains fruits, evidence, and instrumentalities of drug trafficking activities, in violation of 21 U.S.C. §§ 841(a)(1), 843(b), and 846.

### Affiant's Background

3.     I am "an investigative or law enforcement officer . . . of the United States" within the meaning of 18 U.S.C. § 2510(7)—that is, an officer of the United States of America ("United States") who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

4.     I have been an Inspector with the United States Postal Inspection Service ("USPIS") since October 2018, where I am currently assigned to the Maryland Narcotics Team.

Prior to my employment with USPIS, I was a Special Agent with the United States Attorney's Office for the District of Columbia, assigned to the Violent Crimes and Narcotics Trafficking Section, and a Police Officer with the Metropolitan Police Department (Washington, D.C.), assigned to the Narcotics and Special Investigations Division.

5.     Since 2007, as a law enforcement officer, I have participated in numerous drug trafficking investigations during which I have used the following investigative techniques: (1) interviewing informants and cooperating witnesses; (2) conducting physical surveillance; (3) supporting undercover operations; (4) consensual monitoring and recording of both telephonic and non-telephonic communications; (5) analyzing telephone pen register and caller identification system data; (6) conducting court-authorized electronic surveillance; and (7) preparing and executing search warrants that have led to substantial seizures of narcotics, firearms, and other contraband.  I have also applied for federal wire and electronic intercepts; listened to court-authorized intercepted calls between individuals involved or suspected to be involved in drug trafficking activities; reviewed court-authorized text message; and interpreted court-authorized intercepted calls and text messages.

6.     I have also received training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, and narcotics, white-collar, and various other crimes.

7.     In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of proceeds derived from the sale of narcotics, and the organization of drug conspiracies.  I have also become familiar with the ways in which narcotics traffickers use cellular telephones, cellular telephone

technology, coded communications or slang during conversations, and other means to facilitate

their illegal activities and thwart law enforcement investigations.

8.     Specifically, based on your Affiant's training, knowledge, and experience, your

Affiant has learned the following:

a.  Narcotics trafficking is an ongoing and recurring criminal activity. As contrasted with crimes against persons, which tend to be discrete offenses, narcotics trafficking is an illicit commercial activity that is characterized by regular, repeated criminal activity.

b.  Narcotics traffickers commonly compartmentalize members of their organization into discrete "cells," with specific members, responsibilities, and/or geographical territories assigned to each cell, and members of one cell commonly receive information only about that specific cell's criminal activities.  Consequently, this limitation of information frustrates law enforcement efforts to dismantle the entire organization.

c.  High-level narcotics traffickers commonly use multiple cellular telephones.

d.  Cellular telephones are indispensable tools of the narcotics trafficking trade. Narcotics traffickers use cellular telephones, push-to-talk telephones, Short Message Service ("SMS"), electronic mail, and other, similar electronic means and/or devices to maintain contact with co-conspirators and other narcotics traffickers.

e.  Narcotics traffickers often maintain a supply of illegal drugs, items used in the manufacturing, packaging, transportation of illegal drugs, and drug proceeds inside of their residences, their vehicles, and stash locations.

f.  Narcotics traffickers conceal contraband related to illicit activities—such as scales, packaging material, cutting agents, vacuum sealers, and other containers—in locations where they can readily access them, such as their residences, their vehicles, the residences of their friends, family members, and associates, or their drug distribution locations, such as a stash house.

g.  Narcotics traffickers maintain books, records, receipts, notes, ledgers, bank records, money orders, and other papers relating to the importation, manufacture, transportation, ordering, sale, and distribution of narcotics for long periods of time in their residence, their vehicles, the residences of their friends, family members, and associates, or their drug distribution locations. This documentary evidence includes, but is not limited to, telephone numbers, telephone books, address books, credit card and hotel receipts, plane and bus tickets and receipts, car rental receipts, passports, accounts

and records in fictitious names, false identification, money orders, cashier's checks relating to cash transactions and records indicating the existence of storage facilities used in narcotics trafficking. Indicia of occupancy, residency and/or ownership of the premises to be searched are often present in such premises.

h.  Conceal in their vehicles; their residences; the residences of their friends, family members and associates; their drug distribution locations; or other places over which they maintain dominion and control large quantities of United States currency, financial instruments, precious metals, jewelry, and other items of value.

i.  Narcotics traffickers take, or cause to be taken, photos of themselves, their associates, their property, and illegal contraband.  Narcotics traffickers usually maintain these photos in their residence; their vehicles, the residences of their friends; family members or associates; or their drug distribution locations, such as a stash house.

j.  Drug trafficking organizations utilize the United States mail as a means of transporting narcotics and proceeds thereof to and from drug trafficking organization ("DTO") members.  They use United States Priority Mail Express and Priority Mail services to ship narcotics and bulk-cash narcotics proceeds through the United States mail.  Each United States Priority Mail Express and Priority Mail parcel has a distinct tracking number, and an individual with a tracking number can track the particular parcel online. Packages shipped to or from narcotics source states—such as Arizona, California, Texas, Washington, Colorado, and Florida—or territories— such as Puerto Rico—can signify that the United States Priority Mail Express and Priority Mail parcels contain narcotics or the proceeds thereof.

**Bases of Information**

9.      The information contained in this affidavit is based upon my personal knowledge and observations as well as that of the other agents involved in this investigation.  Those agents, persons with knowledge of this investigation, related those observations to me.  Because I submit this affidavit for the limited purpose of establishing probable cause for the requested criminal complaints and arrest and search warrants, I have not included every fact and matter observed by or made known to agents of the government.  Rather, I have set forth only those facts that I believe are necessary to establish probable cause.

**Probable Cause**

*Background Information*

10.     This is an Organized Crime Drug Enforcement Task Force investigation targeting narcotics traffickers in the several states, including Arizona, Maryland, New York, and Ohio.

11.     Based on the evidence gathered during the course of this investigation thus far, investigators believe that Carlyle Lavar Alvarez ("**C. ALVAREZ**") **DTO** supplies others with narcotics—including, but not limited to, wholesale quantities of fentanyl, disguised as Oxycodone pills—through the United States mail.  Among the **C. ALVAREZ DTO** members who have shipped or assisted with the shipment of suspected narcotics parcels to others through the United States mail include **A. ALVAREZ**, who is **C. ALVAREZ**'s brother; **GANN**, who is **C. ALVAREZ**'s significant other; and **REYES**, who is believed to be **A. ALVAREZ**'s significant other.

12.     Investigators have identified approximately eighty (80) suspicious Priority Mail Express and Priority Mail parcels mailed through the USPS from Arizona to addresses in other states between February 2020 and December 2020.  Investigators have seized several of those Priority Mail Express parcels, and the aggregate amount of pills containing fentanyl is approximately 5,161 pills, weighing approximately 562 grams.

13.     On October 22, 2020, the Court entered an Order authorizing, inter alia, the initial interception of wire and electronic communications occurring over the cellular telephone assigned call number (602) 551-4243 used by **C. ALVAREZ** (hereinafter referred to as "**Target Telephone 1**");[1] the initial interception of wire and electronic communications occurring over the cellular

---

[1] Investigators were able to determine that **C. ALVAREZ** used **Target Telephone 1** based on the following:  Investigators (1) determined that the Arizona driver's license photograph of Carlyle Lavar Alvarez and the CCTV footage of the suspected mailer of suspicious packages discussed *infra* are the same person: **C. ALVAREZ**; (2) confirmed through Wal-Mart money

telephone assigned call number (480) 283-3767 used by **C. ALVAREZ** (hereinafter referred to as "**Target Telephone 2**");[2] and the initial interception of wire and electronic communications occurring over the cellular telephone assigned call number (240) 707-9657 used by **RANSOME** (hereinafter referred to as "**Target Telephone 3**")[3] (collectively referred to as the "Initial Wiretap").

14.     On December 2, 2020, Judge Gallagher authorized, inter alia, the renewed interception of wire communications only occurring over **Target Telephone 2** (hereinafter referred to as the "Second Wiretap").

15.     Law enforcement has ceased interception communications occurring over the Initial Wiretap and the Second Wiretap.

16.     On December 19, 2020, at approximately 1:19 a.m. (EST), four days after investigators conducted the controlled delivery as detailed *infra* Paragraphs 68 and 69, investigators stopped receiving pings from **Target Telephone 2**.  Likewise, as of December 18, 2020, there were no longer communications occurring **Target Telephone 2**.  Based on investigators' training, knowledge, and experience, including their involvement in this investigation, investigators believe that **C. ALVAREZ** dropped **Target Telephone 2** after learning about the December 15, 2020 controlled delivery.

---

transfer transaction records that the contact telephone number listed for **C**. **ALVAREZ** was **Target Telephone 1** and video surveillance footage associated with Walmart money transfer transaction described *infra* showed **C. ALVAREZ**; and (3) know through their training, knowledge, and experience that high-level drug traffickers use multiple cellular telephones.

[2] Carlyle Alvarez is listed as the subscriber for **Target Telephone 2.**

[3] Ivan Ransome is listed as the subscriber for **Target Telephone 3.**

*C. ALVAREZ and FLOYD:  Ohio Package 1*

17.     On April 14, 2020, **C. ALVAREZ** mailed a Priority Mail Express parcel from the Maryvale Post Office located at 4415 N. Maryvale Parkway, Phoenix, Arizona ("Maryvale Post Office") destined for 104 Broad Street, Akron, Ohio 44305, with the following characteristics: (1) a return address in Phoenix, Arizona; (2) no association between the sender's and recipient's names and their listed addresses; and (3) weighed approximately six ounces (hereinafter referred to as "**Ohio Package 1**").

18.     The following is an image of **C. ALVAREZ,** holding a United States Mail parcel in each of his hands, from the CCTV footage of the Maryvale Post Office's lobby area:



19.     On April 15, 2020, Honorable Kathleen B. Burke, United States Magistrate Judge for the Northern District of Ohio, issued a search warrant, authorizing the search of **Ohio Package 1** (hereinafter referred to as the "April 15, 2020 warrant").  On the same day, Ohio Postal Inspectors searched **Ohio Package 1** pursuant to April 15, 2020 warrant.  They recovered 500 light blue pills containing fentanyl and weighing approximately 55 grams in the aggregate from inside **Ohio Package 1**.  Of note, those pills bear the letter "M" as an impression marking on one side of them and the number "30" as an impression marking on the other side of them.

20.     **Ohio Package 1** was scheduled for delivery on April 15, 2020, by 3:00 p.m., to 104 Broad Street, Akron, Ohio 44305, if law enforcement had not seized **Ohio Package 1**.

21.     On **Ohio Package 1**'s expected delivery date, **FLOYD**, via (330) 880-1760,[4] contacted the USPS customer service center regarding the delivery status of **Ohio Package 1**. During the telephone call, **FLOYD** identified himself as Mr. Sawhill, which is consistent with the listed recipient's last name for **Ohio Package 1**.  **FLOYD** also provided the following information to the USPS customer service representative during the call:  tracking number (*i.e.*, EK466006747US), delivery address (*i.e.,* 104 Broad Street, Akron, Ohio 44305), recipient's first and last names (*i.e.*, Brian Sawhill), and return telephone number (*i.e.*, (234) 738-8554). Additionally, in response to the USPS customer service representative inquiry about his well-being, **FLOYD** stated, "I'm doin alright, um, my grandson sent me something from Arizona and I had the tracker on it, and it said it should have been here by three and here it is it's almost seven o'clock."

22.     Based on my training, knowledge, and experience, including my involvement in this investigation, I believe that **FLOYD** (i) was the intended recipient of **Ohio Package 1** containing fentanyl; and (ii) provided the fictitious last name listed on **Ohio Package 1** to the USPS customer service representative to identify himself as the intended recipient (and thus be

---

[4] Investigators were able to determine that **FLOYD** used (330) 880-1760 based on the following:  Lavelle Floyd is the subscriber name and 2281 11th Street, SW, Akron, Ohio, 44314—**Ohio Package 2**'s delivery location—as the subscriber's address for (330) 880-1760; a search of law enforcement databases reflect that Lavelle is the middle name of Courtney Floyd; **FLOYD** provided (330) 880-1760 as his telephone number to law enforcement during a January 2018 incident regarding a stolen vehicle; and as recent as June 2020, the police responded to 2281 11th Street, SW, Akron, Ohio, 44314—the residence that **FLOYD** shared with his girlfriend and his stepdaughter, who is the alleged victim and the daughter of **FLOYD**'s girlfriend—regarding a molestation claim against **FLOYD**.

9

able to check on **Ohio Package 1**'s delivery status) and concealed his true identity from law enforcement to the extent law enforcement had seized the fentanyl from **Ohio Package 1**.

### C. ALVAREZ and RANSOME:  Maryland Package 1

23.     On April 16, 2020, **C. ALVAREZ** mailed a Priority Mail Express parcel from the Capitol Post Office located at 2 S. 35th Avenue, Phoenix, Arizona 85009 destined for the **Target Premises**, with the following characteristics: (1) a return address in Phoenix, Arizona; (2) no association between the sender's and recipient's name and listed addresses; and (3) weighed approximately eleven ounces (hereinafter referred to as "**Maryland Package 1**").  **Maryland Package 1** was delivered on April 17, 2020, at 12:25 p.m.

24.     Notably, the sender's name and address listed on **Maryland Package 1** are the same as the sender's name and address listed on **Ohio Package 1**.

25.     On April 17, 2020, the same day as **Maryland Package 1**'s delivery, at approximately 6:09 p.m., **RANSOME** sent a $2500.00 money transfer in the Walmart located at 17850 Garland Groh Boulevard, Hagerstown, Maryland, 21740 (hereinafter referred to as "Hagerstown Walmart") to **C. ALVAREZ**.  On the same day, about six minutes after **RANSOME** sent the $2500.00 money transfer, **C. ALVAREZ** picked up the $2500.00 money transfer at the Walmart located at 7975 W Peoria Avenue, Peoria, Arizona, 85345 (hereinafter referred to as "Peoria Walmart Supercenter").  **C. ALVAREZ** became angry about answering questions regarding the $2,500.00 money transfer transaction.

26.     The following on the left is an image of **RANSOME**, sending the $2500.00 money transfer, from Hagerstown Walmart video surveillance footage while the following on the right is an image of **C. ALVAREZ**, picking up the $2500.00 money transfer, from Peoria Walmart Supercenter video surveillance footage:



27.     Based on my training, knowledge, and experience, including my involvement in this investigation, I believe that (i) **Maryland Package 1** contained narcotics; (ii) **RANSOME** (a) received **Maryland Package 1** delivered to **Target Premises**; and (b) traveled to the Hagerstown Walmart to pay **C. ALVAREZ** for the narcotics in **Maryland Package 1**, that **C. ALVAREZ** supplied to **RANSOME** through the United States mail; and (iii) **C. ALVAREZ** retrieved the $2500.00 in drug proceeds from the Peoria Walmart Supercenter.

*C. ALVAREZ and FLOYD:  Mailing of Ohio Package 2*

28.     On April 21, 2020, **C. ALVAREZ** mailed a Priority Mail Express parcel from the Peoria Downtown Post Office located at 10700 N. 85th Avenue, Peoria, Arizona 85345 ("Peoria Downtown Post Office") destined for 2281 11th Street, SW, Akron, Ohio 44314—an address previously associated with **FLOYD**—with the following characteristics: (1) a return address in Phoenix, Arizona; (2) no association between the sender's and recipient's names and listed addresses; and (3) weighed approximately five ounces (hereinafter referred to as "**Ohio Package 2**").

29.     The following is an image of **C. ALVAREZ**, handling the cash transaction for **Ohio Package 2**'s shipment, from the CCTV footage of the Peoria Downtown Post Office's transaction counter area:

11



30.     On April 22, 2020, United States Magistrate Judge Burke issued a search warrant, authorizing the search of **Ohio Package 2** (hereinafter referred to as the April 22, 2020 warrant"). On the same day, Ohio Postal Inspectors searched **Ohio Package 2** pursuant to the April 22, 2020 warrant.  They recovered 201 light blue pills, containing fentanyl and weighing approximately 22 grams in the aggregate, from inside of **Ohio Package 2.**  Of note, those pills bear the letter "M" as an impression marking on one side of them and the number "30" as an impression marking on the other side of them.

31.     The toll data from **Ohio Package 2**'s delivery date reflects a substantial amount of communications between **C. ALVAREZ**, via **Target Telephone 1**, and **FLOYD**, via (330) 880-1760, from approximately 12:12 p.m. to 8:22 p.m.  Specifically, the toll data shows that **FLOYD**, via (330) 880-1760, made an outgoing telephone call to **C. ALVAREZ**, via **Target Telephone 1**, at approximately 12:12 p.m.  That call lasted for approximately seven minutes and twenty-eight seconds.  The toll data further shows that, several minutes after that call concluded, **C. ALVAREZ**, via **Target Telephone 1**, sent **FLOYD**, via 330-880-1760, six IM chat messages.  The toll data also reflects that **FLOYD**, via 330-880-1760, made an outgoing telephone call to **C. ALVAREZ**, via **Target Telephone 1**, at approximately 2:37 p.m.  That call lasted for approximately forty seconds.  The toll data further reflects that **FLOYD**, 330-880-1760, received eight IM chat

messages from **ALVAREZ**, **Target Telephone 1**, between 5:12 p.m. and 6:02 p.m.  The toll data also reflects that **FLOYD**, via (330) 880-1760, received an incoming telephone call from **C. ALVAREZ**, via **Target Telephone 1**, at approximately 8:22 p.m.   That call lasted for approximately 2 minutes and twenty-two seconds.

32.     Based on my training, knowledge, and experience, including my involvement in this investigation, I believe that, **FLOYD** was the intended recipient of **Ohio Package 1** containing fentanyl.

### C. ALVAREZ and RANSOME:  Mailing of Maryland Package 2

33.     On May 15, 2020, **C. ALVAREZ** mailed a Priority Mail Express parcel from the Peoria Downtown Post Office destined for  the **Target Premises** with the following characteristics: (1) a return address in Peoria, Arizona; (2) no association between the sender's and recipient's listed addresses; and (3) weighed approximately twenty ounces (hereinafter referred to as "**Maryland Package 2**").

34.     The following is an image of **C. ALVAREZ** at the transaction counter from the CCTV footage of the Peoria Downtown Post Office's counter area:



35.     On May 26, 2020, Honorable Timothy J. Sullivan, United States Magistrate Judge for the District of Maryland, issued a warrant, authorizing the search of **Maryland Package 2** (hereinafter referred to as the "May 26, 2020 warrant").  On the same day, investigators searched **Maryland Package 2** pursuant to the May 26, 2020 warrant.  They recovered 4,015.5 light

blue/green pills, containing fentanyl and weighing approximately 437 grams in the aggregate, from inside of **Maryland Package 2**.

36.     Based on my training, knowledge, and experience, including my involvement in this investigation, I believe that, **RANSOME** was the intended recipient of **Maryland Package 2** containing fentanyl.

*GANN:  New York Package 1*

37.     On October 28, 2020, at approximately 1:11 p.m. (MST), investigators observed Maria Alvarez depart from 2323 N. 39th Avenue, Peoria, Arizona, 85345.  Several minutes later, the 2014 silver Infiniti Q50 bearing Arizona license plate number CJF5249 registered to Jennifer Jean Gann and Carlyle Lavar Alvarez, 8927 W Purdue Avenue, Peoria, Arizona, 85345 (hereinafter referred to as "**C. ALVAREZ's Vehicle**") departed from the front area of 2321 N. 39th Avenue, Phoenix, Arizona 85009 (hereinafter referred to as "**C. ALVAREZ and GANN's residence**").  **GANN** was the driver of **C. ALVAREZ's Vehicle**; **C. ALVAREZ** was the front-seat passenger of **C. ALVAREZ's Vehicle**; and two children were in the back seat of **C. ALVAREZ's Vehicle.**

38.     Investigators followed **C. ALVAREZ's Vehicle** from the front area of **C. ALVAREZ and GANN's residence** to the Maryvale Post Office and observed **C. ALVAREZ and GANN,** carry envelopes that matched the description of Priority Mail flat rate envelope(s), into the Maryvale Post Office.

39.     In the Maryvale Post Office, **GANN** mailed a Priority Express Mail parcel destined to 2537 Church Avenue, Apartment 3R, Brooklyn, New York, 11226, with the following characteristics: (1) a return address in Phoenix, Arizona; (2) no association between the sender's

and recipient's names and addresses; and (3) weighed approximately six ounces (hereinafter referred to as "**New York Package 1**").

40.     On November 5, 2020, Honorable Stewart D. Aaron, United States Magistrate Judge for the Southern District of New York, issued a warrant, authorizing the search of **New York Package 1** (hereinafter referred to as "New York November 5, 2020 warrant").  On the same date, New York Postal Inspectors searched **New York Package 1** pursuant to the New York November 5, 2020 warrant.  They recovered approximately 496 light blue pills—one of which field-tested positive for fentanyl—from inside **New York Package 1**.  Of note, those pills bear the letter "M" as an impression marking on one side of them and the number "30" as an impression marking on the other side of them.  The drug analysis for those pills are pending.

*C. ALVAREZ and FLOYD: Ohio Package 3*

41.     In the Maryvale Post Office, around the same time that **GANN** mailed **New York Package 1**, **C. ALVAREZ** mailed a Priority Express Mail parcel destined to 410 Locust Street, Apartment 102, Akron, Ohio, 44307 (alternatively referred to as "Apartment 102") with the following characteristics: (1) a return address in Phoenix, Arizona; (2) no association between the sender's and recipient's names and their listed addresses; and (3) weighed approximately three ounces (hereinafter referred to as "**Ohio Package 3**").

42.     Within minutes of **C. ALVAREZ**'s mailing of **Ohio Package 3**, **C. ALVAREZ**, via **Target Telephone 1**, made an outgoing telephone call to **FLOYD**, via (330) 880-1760.  During their discussion, **C. ALVAREZ** asked, "What's the the one (1), O', two (2) for?" to which **FLOYD** responded, "That's the um- apartment number." **C. ALVAREZ** then asked, "Apartment number, bro'?" **FLOYD** then confirmed so: "Yeah." Before the call ended, **C. ALVAREZ** said, "One (1), O', two (2). A'ight. Akron, Ohio, Four (4) ten (10) Lotus Street [PH], uh one (1), O', two (2)."

15

Based on my training, knowledge, and experience, including my involvement in this investigation, I believe that **C. ALVAREZ** confirmed in vague, coded language the address to which **C. ALVAREZ** mailed **Ohio Package 3**.

43.     On October 29, 2020, at approximately 12:47 p.m., **Ohio Package 3** was delivered.

44.     On the same day, at approximately 5:10 p.m., **FLOYD** exited Apartment 102, opened a mailbox, retrieved a white envelope, and eventually returned to Apartment 102 with the white envelope.

45.      Based on my training, knowledge, and experience, including my involvement in this investigation, (i) **FLOYD** (a) was the intended recipient of **Ohio Package 3**; and (b) retrieved **Ohio Package 3** from Apartment 102's mailbox; and (ii) **Ohio Package 3** contained narcotics.

*Narcotics Payments to C. ALVAREZ*

46.     During the Initial Wiretap, investigators learned that **C. ALVAREZ** also provided a narcotics customer with information for a cash app account—"$sweetness8225—believed to be maintained by **GANN**, to deposit payments for narcotics previously supplied by **C. ALVAREZ**. Pertinent intercepted communications are as follows:

a.      On October 24, 2020, at approximately 6:51 p.m. (MST), **C. ALVAREZ**, via **Target Telephone 2**, received an incoming call from **Unknown Male** ("**UM**"), via (717) 710-1543.  Here is an excerpt of their discussion:

**C. ALVAREZ**: Yo?

**UM**: Yo, yo, uhm...yeah man, this nigga, I gotta [sic] fire [PH] him.  He sometimes-motherfuckers tell you want you want to hear, that's the...but, here is the thing.  He had called me back like an hour later, he was like, it got like a harsh...like, taste to it.

16

Based on information obtained during the course of this investigations, as well as my, training, knowledge, and experience, I believe that **C. ALVAREZ** previously supplied **UM** with narcotics; and **UM** in vague, coded language provided **C. ALVAREZ** with feedback about those narcotics' quality (*i.e.*, "It got like a harsh...like taste to it.")

      b.     On November 2, 2020, at approximately 12:22 p.m. (MST), **C. ALVAREZ**, via **Target Telephone 2**, received an incoming telephone call from **UM**, via (717) 710-1543.  Here is an excerpt of their discussion:

      **C. ALVAREZ:** You-you busy?

      **UM**: A little-a-a-little bit.  I gotta take her to work.

      **C. ALVAREZ**: A'ight, 'c-'cause-a'ight.  I need 'ju to send me fifteen-hunnit, (1,500), bro'-bro'.

      **UM**: A'ight.  How I'mma do that?

      **C. ALVAREZ**: [PAUSE] Western Union, CashApp, or Zelle.

Based on information obtained during the course of this investigation, as well as my training, knowledge, and experience, I believe that, in vague, coded language (i) **C. ALVAREZ** requested **UM** to pay soon a minimum amount of $1,500.00—(*i.e.*, fifteen-hunnit")—towards **UM**'s narcotics debt owed to **C. ALVAREZ**; (ii) **UM** agreed to do so—(*i.e.*, "A'ight"); (iii) **UM** inquired how **C. ALVAREZ** wanted **UM** to make the narcotics payment—(*i.e.*, "How I'mma do that"); and (iv) **C. ALVAREZ** instructed the **UM** to use any of the following currency transfer services—(*i.e.*, Western Union, CashApp, Zelle).

      c.     On November 2, 2020, between approximately 12:25 p.m. and 12:28 p.m. (MST), **C. ALVAREZ**, via **Target Telephone 2**, sent two outgoing text messages to **UM**, via

(717) 710-1543, that read: "$sweetness8225," and "Jennifer Jean gann," respectively.  Based on investigators' training, knowledge, and experience, including their experience in this investigation, investigators believe that **C. ALVAREZ** texted "$sweetness8225," to the **UM** to identify the profile name of the Cash App account where **C. ALVAREZ** wanted the **UM** to deposit the $1,500.00 narcotics payment, and sent the follow-up text "Jenifer Jean gann," to identify the individual who maintained that account: **GANN**.

d.       On the next day, at approximately 12:43 p.m. (MST), **C. ALVAREZ**, via **Target Telephone 2**, made an outgoing telephone call to **GANN**, via (602) 503-8502.[5]  Here is their full discussion:

> **C. ALVAREZ**: Hello, baby.
>
> **GANN**: We don't got no cash, babe.
>
> **C. ALVAREZ**: Babe, you call for that, babe?
>
> **GANN**: Well I'm telling you. Are you gonna [sic] have them send something?
>
> **C. ALVAREZ**: Babe, you calling for that, baby?
>
> **GANN**: A'right. a'right, I'm almost there.
>
> **C. ALVAREZ**: A'right.
>
> **GANN**: I just-

Based on my training, knowledge, and experience, including my involvement in this investigation, investigators believe in vague, coded language, that (i) **GANN** (a) told **C. ALVAREZ** that **GANN** has not received the expected narcotics payments through **GANN**'s Cash App account; and (b) requested that **C. ALVAREZ** contact the individuals whom **C. ALVAREZ**

---

[5] Jennifer J. Gann is listed as the subscriber for (602) 503-8502.

supplies with narcotics to pay their drug debt owed to **C. ALVAREZ**, so **GANN** and **C. ALVAREZ** could have money; (ii) **C. ALVAREZ** expressed his displeasure with **GANN** discussing narcotics-related matters over the telephone; and (iii) **GANN** advised **C. ALVAREZ** that **GANN** was near **C. ALVAREZ**'s location.

*GANN and FLOYD:  Ohio Package 4*

47.     On November 3, 2020, at approximately 1:45 p.m. (MST), approximately one hour after **GANN** asked **C. ALVAREZ** to contact those whom **C. ALVAREZ** supplied with narcotics to pay their narcotics debt, investigators observed **C. ALVAREZ**, carrying what appeared to be a plastic shopping bag, and **GANN** exit **C. ALVAREZ** and **GANN**'s residence.  **GANN** entered the driver's seat of **C. ALVAREZ's Vehicle**, and **C. ALVAREZ** entered the front passenger seat of **C. ALVAREZ's Vehicle**.  Shortly after, **GANN**, driving **C. ALVAREZ's Vehicle**, left that area.

48.     Investigators followed **C. ALVAREZ's Vehicle**, but they eventually lost sight of **C. ALVAREZ's Vehicle** during surveillance.  However, at approximately 2:48 p.m. (MST), GPS/PLI data reflected that **Target Telephone 1** was in the area of 8155 N Canyon Highway, Phoenix, Arizona, 85021.

49.     Investigators traveled to the Washington Post Office located at 8155 N. Canyon Highway, Phoenix, Arizona 85021 ("Washington Post Office") and observed **C. ALVAREZ's Vehicle** parked in the Washington Post Office's parking lot.  And an Arizona Postal Inspector observed **C. ALVAREZ** at the USPS customer counter of the Washington Post Office.

50.     **GANN** mailed a Priority Mail Express parcel to 410 Locust Street, Apartment 102, Akron, Ohio, 44307 with the following characteristics: (1) a return address in Phoenix, Arizona; (2) no association between sender's and recipient's last name and addresses; and (3) weighed approximately five ounces (hereinafter referred to as "**Ohio Package 4**").

51.     The following is an image of **GANN** at the transaction counter from the CCTV footage of the Washington Post Office's counter area:



52.     Later on **Ohio Package 4**'s mailing date, **C. ALVAREZ**, via **Target Telephone 1**, made an outgoing telephone call to **FLOYD**, via (330) 880-1760.  During that call, **C. ALVAREZ** said, "Yeah, that's in the air," and subsequently followed up, "You heard me?" **FLOYD** responded, "Si."  Based on my training, knowledge, and experience, including my involvement in this investigation, I believe that (i) **C. ALVAREZ** in vague, coded language, confirmed that the narcotics inside of **Ohio Package 4** were mailed to 410 Locust Street, Apartment 102, Akron, Ohio, 44307, for **FLOYD**; and (ii) **FLOYD** acknowledged that he understood.

53.     On the next day, at approximately 1:35 p.m. (MST), **C. ALVAREZ**, via **Target Telephone 1**, placed an outgoing telephone call to **FLOYD**, via (330) 880-1760.  During their call, **FLOYD** said, "Man, they are trying to find the package.  That motherfucker never even made it here, man. . . . .So, now they trying to track down the damn whole package."  **C. ALVAREZ** then asked, "So, how is it hittin' the alert and all that?"  **FLOYD** replied, "Hitin' the alert. . . . But

one of this other carriers got it."  **C. ALVAREZ** then said, "Yeah, of course, my nigga."  Based on my training, knowledge, and experience, as well as information obtained during the course of this investigation, I believe that, in vague, coded language, (i) **FLOYD** (a) told **C. ALVAREZ** that **Ohio Package 4** had not arrived yet; and (b) USPS postal workers were trying to locate **Ohio Package 4**.

54.    On November 5, 2020, United States Magistrate Judge Burke issued a warrant, authorizing the search of **Ohio Package 4** (hereinafter referred to as the "Ohio November 5, 2020 warrant").   On the same day, investigators searched **Ohio Package 4** pursuant to the Ohio November 5, 2020 and recovered 200 light blue/green pills, containing fentanyl and weighing approximately 21 grams in the aggregate, from inside **Ohio Package 4**.  Of note, those pills bear "M" as an impression marking on one side of them and the number "30" as an impression marking on the other side of them.

*C. ALVAREZ:  New Jersey Package 1*

55.    In the Washington Post Office shortly after **GANN** mailed **Ohio Package 4**, **C. ALVAREZ** mailed a Priority Mail Express parcel to 126 Clifton Place, Apartment 1008, Jersey City, New Jersey, 07304, with the following characteristics: (1) a return address in Phoenix, Arizona; (2) no association between the sender's and recipient's names and addresses; and (3) weighed approximately five ounces (hereinafter referred to as "**New Jersey Package 1**").

56.    The following is an image of **C. ALVAREZ** at the transaction counter from the CCTV footage of the Washington Post Office's counter area:



57.     On November 6, 2020, Honorable Michael T. Morrissey, United States Magistrate Judge for the District of Arizona, issued a warrant, authorizing the search of **New Jersey Package 1** (hereinafter referred to as the New Jersey November 6, 2020 warrant").   On the same day, Arizona Postal Inspectors searched **New Jersey Package 1** and recovered approximately 200 light green pills—that field-tested positive for Acetaminophen—from inside **New Jersey Package 1**. Of note, those pills bear "M" as an impression marking on one side of them and the number "30" as an impression marking on the other side of them.   The drug analysis for those pills are pending.

*C. ALVAREZ, A. ALVAREZ, REYES, and MIDDLETON:*
*The New York Packages*

58.     During the Second Wiretap, investigators learned about an approximately two kilogram quantity of cocaine transaction involving **C. ALVAREZ** and **MIDDLETON** as well as the shipment of the same involving **A. ALVAREZ** and **REYES**.

59.     On December 7, 2020, at approximately 4:43 p.m. (MST), **C. ALVAREZ**, via **Target Telephone 2**, received an incoming call from **MIDDLETON**, via (602) 367-0956.[6]   Here is an excerpt of their discussion:

---

[6] As discussed *infra* Paragraph 69, law enforcement seized the cellular telephone assigned call number (602) 367-0956 that belonged to **MIDDLETON** from the couch on the ground floor of the **New York Packages'** delivery.

**MIDDLETON**: Yeah, what I was trynna [sic] say, Chi, call your boy to see if he's good because I'm trynna fuck with these niggas. These niggas got me stressed out over that little two-fifty (250), you know?

**C. ALVAREZ**: Yeah. [BACKGROUND: UC VOICE][VOICES OVERLAP].

**MIDDLETON**: Damn, man. Let's see if we got options. 'Cause if it wasn't for homie I wouldn't even be ready, you know?

**C. ALVAREZ**: Yeah.

**MIDDLETON**: Yeah, let's see if they- if they Gucci. Let's see if- what they number- if not...

**C. ALVAREZ**: Alright, I'm wondering if I could call now.

**MIDDLETON**: And yeah, two (2). Just see what the number is or, you know?

**C. ALVAREZ**: Yeah. [VOICES OVERLAP]

**MIDDLETON**: I don't really wanna [sic] deal with them with these numbers they talkin' 'bout. They not playing fair. These niggas not respecting every time I come, I'm coming up more, more, and more, you know?

**C. ALVAREZ**: [BACKGROUND: UC VOICE] Yeah.

**MIDDLETON**: Ain't respecting shit, so. [PAUSE] Let's check. But, I'm here, bro'.

**C. ALVAREZ**: A'ight.

Based on my training, knowledge, and experience, including my experience in this investigation, I believe that, in vague, coded language, (1) **MIDDLETON** (i) asked **C. ALVAREZ** to contact narcotics suppliers for quotes for the narcotics that **MIDDLETON** wanted to purchase for distribution; and (ii) **MIDDLETON** expressed her dissatisfaction with the price quoted for the amount of narcotics that **MIDDLETON** was purchasing—(*i.e.*, "I don't really

23

wanna [sic] deal with them with these numbers they talkin' bout.  They not playing fair."); and (iii) **MIDDLETON** believed she should receive a lower price for the narcotics due to **MIDDLETON** continually purchasing additional narcotics—(*i.e.*, "I'm coming up more, more, and more"); and (2) **C. ALVAREZ** agreed to do as **MIDDLETON** requested.

     60.    On December 7, 2020, at approximately 4:50 p.m. (MST), **C. ALVAREZ**, via **Target Telephone 2**, made an outgoing telephone call to **MIDDLETON**, via (602) 367-0956. Here is an excerpt of their discussion:

    **C. ALVAREZ**: Uh, I'm waiting for a call back from the homie and then I just finished speaking to uh, Ice Cream Man.

    **MIDDLETON**: And what he talkin' 'bout?

    **C. ALVAREZ**: He said thir- he said thirty-four (34). He know for sure it's- it's- it's a hundred (100%) percent- it's a hundred (100%) percent- it could float and it could melt.

    [VOICES OVERLAP]

    **MIDDLETON**: That's what we gotta [sic] make sure, 'cause that's what these niggas think- that somebody on them that like- yo, I'm telling you, I'm a little mad. I'm stressed, bro'. Super stressed, but I'm with you, you know?

    **C. ALVAREZ**: Yeah.

    **MIDDLETON**: Yeah, I tell- I gotta chop it with you, soon as I pull up.

Based on investigators' training, knowledge, and experience, including their experience during the course of this investigation, investigators believe that **C. ALVAREZ**, in vague, coded language, (i) confirmed with **MIDDLETON** that **C. ALVAREZ** spoke with a narcotics supplier, who provided a quote—(*i.e.*, thirty-four)—for the narcotics that **MIDDLETON** wanted to purchase for distribution; and (ii) confirmed the quality of those narcotics—(*i.e.*, "it could float

and it could melt."). Based on my training, knowledge, and experience, including my experience during the course of this investigation, I further believe that **MIDDLETON** stated that **MIDDLETON** and **C. ALVAREZ** (i) must ensure that those narcotics are of the quality that they desired—(*i.e.*, "That's what we gotta [sic] make sure"); and (ii) will discuss **MIDDLETON** and **C. ALVAREZ**'s narcotics trafficking activities further in person—(*i.e,* "I gotta chop it with you, soon as I pull up.").

61.     On December 9, 2020, pole camera footage reflects that, between approximately 12:41 and 12:43 p.m. (MST), **REYES** and **A. ALVAREZ** exited 2323 N. 39th Avenue, Phoenix, Arizona 85009 ("2323 N. 39th Avenue"), enter a dark sedan, and drove away from 2323 N. 39th Avenue. The pole camera footage further reflects that, a little over thirty minutes later, (i) the dark sedan (a) returned and (b) was parked in the shared driveway of 2323 N. 39th Avenue and 2325 N. 39th Avenue, Phoenix, Arizona 85009; and (ii) **REYES** and **A. ALVAREZ** exited the dark sedan. The pole camera footage also reflects that **A. ALVAREZ** (i) subsequently removed at least two empty brown boxes from the passenger area of the dark sedan; and (ii) carried the empty brown boxes into 2323 N. 39th Avenue**.**

62.     On the same day, pole camera footage reflects that, between approximately 1:45 p.m. and 1:48 p.m. (MST), **A. ALVAREZ**, carrying a total of two boxes one at a time, and **REYES**, carrying one box, exited 2323 N. 39th Avenue; walked to the dark sedan parked on the west side of 2323 N. 39th Avenue; and placed those boxes into the dark sedan. The pole camera footage further reflects that, at approximately 1:48 p.m. (MST), **MIDDLETON** exited 2323 N. 39th Avenue; **A. ALVAREZ**, **REYES**, and **MIDDLETON** eventually entered the dark sedan; and the dark sedan departed from the west side of 2323 N. 39th Avenue.

25

63.     At approximately 2:07 p.m. (MST), **REYES**, carrying two boxes, and **A. ALVAREZ**, carrying one box, entered the Osborn Post Office located at 3905 North Seventh Avenue, Phoenix, Arizona 85013 ("Osborn Post Office").

64.     Additionally, between approximately 2:31 p.m. (MST) and 2:39 p.m. (MST), **REYES** handed two Priority Express Mail parcels destined for 116-50 Lincoln Street, South Ozone Park, New York, 11420 (hereinafter referred to as the "**New York Packages**") to a USPS associate at the transaction counter for shipment and paid shipping costs of the **New York Packages**; and (ii) **A. ALVAREZ** obtained the change from that cash transaction.

65.     The following on the left is an image of **A. ALVAREZ** and **REYES**, waiting together with boxes, from the CCTV footage of the Osborn Post Office while the following on the right is an image of **A. ALVAREZ** and **REYES** at the transaction counter from the CCTV footage of the Osborn Post Office:



66.     During the Second Wiretap, **C. ALVAREZ** followed up on the **New York Packages**.   For instance, on December 11, 2020, at approximately 2:13 p.m. (MST), **C. ALVAREZ**, via **TT-2**, made an outgoing to telephone call to **MIDDLETON**, via (602) 367-0956.  Here is an excerpt of their discussion:

**C. ALVAREZ**: That shit in hand?

**MIDDLETON**: Nah, it's- it's still saying, it ain't say, "Out for delivery," yet. It- it say it's on that side, though.

Based on information obtained during the course of this investigation, as well as my training, knowledge, and experience, I believe in vague coded language (i) **C. ALVAREZ** called **MIDDLETON** to determine if the **New York Packages** had been delivered (*i.e.*, "That shit in hand"); and (ii) **MIDDLETON** (a) confirmed that the **New York Packages** had not been delivered; and (b) indicated that **MIDDLETON**, or someone at **MIDDLETON's** direction, checked the **New York Packages**' delivery status.

67.    On December 14, 2020, Honorable Lois Bloom, United States Magistrate Judge for the Southern District of New York, issued a warrant, authorizing the search of the **New York Packages** (hereinafter referred to as the "December 14, 2020 warrant").   On the same day, Postal Inspectors searched the **New York Packages** pursuant to the December 14, 2020 warrant and recovered approximately one kilogram of cocaine in each of the **New York Packages**.

68.    On December 15, 2020, United States Magistrate Judge Bloom issued two warrants—one, authorizing the tracking of the **New York Packages** ("December 15, 2020 tracking warrant"); and two, authorizing the search of premises in which the **New York Packages** were opened ("December 15, 2020 residential warrant").   Later on the same day, at approximately 4:12 p.m. (EST), USPIS, Homeland Security Investigations, and the New York City Police Department conducted a controlled delivery at the **New York Packages'** delivery address.   During the delivery, a USPIS Inspector, working in an undercover capacity, delivered the **New York Packages** to **MIDDLETON** at the front door of the **New York Packages'** delivery address, although **MIDDLETON** does not rent or own the residence.

69.    After receiving an alert from one of the trip devices installed inside of the **New York Packages**, pursuant to the December 15, 2020 tracking warrant, law enforcement entered

the **New York Packages'** delivery address pursuant to the December 15, 2020 residential warrant. During the December 15, 2020 residential warrant execution, law enforcement observed **MIDDLETON** on the ground floor. Among the items that law enforcement seized was a black Samsung Galaxy, Model No. SM-A015AZ, bearing IMEI No. 351721112380809, belonging to **MIDDLETON** ("**MIDDLETON's cellphone**") from the **New York Packages'** delivery address.

70.    On December 29, 2020, Honorable Thomas M. DiGirolamo, United States Magistrate Judge for the District of Maryland, issued a warrant authorizing the search of, inter alia, **MIDDLETON**'s cellphone.

71.    During a search of **MIDDLETON's cellphone**, investigators learned that **MIDDLETON**'s cellphone is assigned the cellular telephone assigned call number (602) 367-0956.

72.    Investigators also discovered during the search of **MIDDLETON's cellphone** that, (i) at approximately 1:08 p.m. (MST), on the day immediately after **C. ALVAREZ** followed up with **MIDDLETON** about **New York Packages'** delivery status, **REYES**, via (843) 694-9763,[7] provided **MIDDLETON**, via (602) 367-0956, with a photograph of the USPS receipt containing the tracking numbers for the **New York Packages**; and (ii), on December 15, 2020, at approximately 10:22 a.m. (MST) **REYES**, via (843) 694-9763, sent the following instant message to **MIDDLETON**, via (602) 367-0956:  "Good morning, says out for delivery."  Based on my training, knowledge, and experience, including my involvement in this investigation, I believe that

---

[7] Investigators were able to determine that **REYES** used (843) 694-9763 based on the following: (1) Investigators determined that a comparison of the Arizona driver's license photograph of Millie Reyes, as well as other information obtained during the course of this investigation, and the image from CCTV footage of the **New York Packages'** mailer discussed *supra* are the same person: **REYES**; (2) **MIDDLETON's cellphone** received a photograph of the USPS receipt containing the tracking numbers for the **New York Packages**; and (3) (843) 694-9763 is listed under Millie, the first name of **REYES**, in **MIDDLETON's cellphone.**

REYES alerted **MIDDLETON** that the **New York Packages** containing approximately two kilograms of cocaine would be delivered that day.

73.     Investigators further learned, on December 15, 2020, at approximately 2:46 p.m. (MST) that **MIDDLETON** received an incoming call from **A. ALVAREZ**, via (602) 644-6144,[8] lasting for 0 seconds.   Based on my training, knowledge, and experience, including my involvement in this investigation, I believe that, based on the timing of the communication, **A. ALVAREZ** contacted **MIDDLETON** to follow up about **MIDDLETON**'s receipt of the **New York Packages** containing approximately two kilograms of cocaine.

74.     Based on information obtained during the course of this investigation, as well as my training, knowledge, and experience, I believe that **MIDDLETON** (i) traveled to Phoenix, Arizona, to coordinate a multi-kilogram cocaine transaction; (ii) was the intended recipient of the approximately two kilograms of cocaine seized from the **New York Packages**; and (iii) was at the **New York Packages**' delivery address to (a) oversee the delivery of the **New York Packages'**; and (b) take custody of the approximately two kilograms of cocaine that were originally inside of the **New York Packages**.

*The Target Premises*

75.     **Target Telephone 3** is subscribed to **RANSOME**, and the **Target Premises** is listed as the subscriber's address.

76.     During the Initial Wiretap, **RANSOME** discussed narcotics belonging to **C. ALVAREZ** that **C. ALVAREZ** intended to supply to **A. ALVAREZ**, and were stolen from the **Target Premises**.   Specifically, on October 23, 2020, at approximately 9:50 a.m. (EST),

---

[8] A Square, Inc. subpoena return for an account maintained by **A. ALVAREZ** identified (602) 644-6144 as the telephone number for **A. ALVAREZ**.

**RANSOME**, via **Target Telephone 3**, received an incoming telephone call from **Jack Peele**, via

(813) 543-7178.[9]  Here is an excerpt of their discussion:

> **RANSOME**: So, when I spoke to him the other day. I got a little five thousand (5,000) for
> him. I'm like...
>
> **PEELE**: Uh-huh.
>
> **RANSOME**: "Nigga, you took all the fucking work." I said, nigga left me with a thousand
> pills. I said, "After I pay my bills, and if I send you five thousand dollars, nigga. I'm broke.
> You think I'm about to be broke? [U/I], nigga. . . .
>
> **RANSOME**: So, he had bought them pills for Antoine. Right?
>
> **RANSOME**: [U/I] Antoine get the pills [U/I]. So, when they broke into my crib, they stole
> all that shit.
>
> **PEELE**: Right.
>
> **RANSOME**: This nigga thought, this niggas was thinking probably, 'cause to tell you the
> truth, he got [U/I] between the lines. He probably thought I robbed him. He like, "Yo. You
> got over." "Got over?" I said, "Nigga, I took the biggest lost. Fuck is you talking about?"
>
> **PEELE**: Oh, he's saying like you set up the robbery [LAUGHS]...

Based on information obtained during the course of this investigation, as well as my

training, knowledge, and experience, I believe in vague, coded language **RANSOME** vented to

**PEELE** about **C. ALVAREZ** (i) leaving **RANSOME** with 1,000 fentanyl pills only; (ii)

requesting **RANSOME** to send **C. ALVAREZ** $5,000.00 in drug proceeds, which would leave

**RANSOME** without any money after **RANSOME** paid **RANSOME**'s bills; and believing that

---

[9] Law enforcement identified (813) 543-7178 as belonging to **PEELE** through, in part, a
Walmart money transfer transaction that **PEELE** sent to **C. ALVAREZ** on April 6, 2020.
Investigators obtained records from Walmart that confirmed that, on April 6, 2020, at
approximately 5:54 p.m., **PEELE** sent **C. ALVAREZ** a $200.00 money transfer from a Walmart
located at 1355 E Lehman Street Lebanon, Pennsylvania 17046 ("Lebanon Walmart").  The
primary photo ID type for the $200.00 money transfer transaction sent by **PEELE** to **C.
ALVAREZ** matches **PEELE'**s Pennsylvania driver's license number.

**RANSOME** played a part in the fentanyl pills, including those belonging to **C. ALVAREZ** that **C. ALVAREZ** intended to supply to **A. ALVAREZ**, being stolen from the **Target Premises**.

77.     During the Initial Wiretap, **Target Telephone 3** regularly pinged overnight in the vicinity of the **Target Premises**.

78.     On November 9, 2020, a non-fatal overdose victim reported to the Hagerstown Police Department that the victim purchased drugs from Ivan Ransome of 42 East Avenue, Apartment 1E.

79.     As recent as January 4, 2021, I observed **RANSOME**'s vehicle—2014 silver Mercedes Benz bearing Virginia license plate number 31752HM and Vehicle Identification Number WDDSJ4GBXEN106606, registered to Ivan  A. Ransome, 32 E Washington Street, Apartment 1, Hagerstown, Maryland, 21740—parked in the rear of the **Target Premises**.

80.     As recent as January 8, 2021, at approximately 11:38 a.m., investigators observed RANSOME exit the front entrance of 42 East Avenue, Hagerstown, Maryland 21740—the building in which the **Target Premises** is located—and proceeded directly to **RANSOME**'s vehicle that was located at the curb directly across the street from the **Target Premises**; enter **RANSOME**'s vehicle; and drive away.

### Conclusion

81.     Based on the foregoing, your affiant submits that there is probable cause to believe that **C. ALVAREZ**, **GANN**, **A. ALVAREZ**, **REYES**, **FLOYD**, **MIDDLETON**, and **RANSOME** are engaging in drug trafficking activities in violation of 21 U.S.C. § 846; and (ii) the **Target Premises** contains fruits, evidence, and instrumentalities of drug trafficking activities, including those items listed in Attachment B.

82.     Accordingly, your Affiant respectfully requests the issuance of the requested criminal complaints and arrest warrants.  Your Affiant further requests a search warrant for the **Target Premises**, as fully described in Attachment A, for the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of drug trafficking activities in violation of 21 U.S.C. §§ 841(a)(1), 843(b), and 846, and the seizure of the items listed in Attachment B.

Respectfully submitted,

*Derek Starliper*
Derek Starliper, Inspector
U.S. Postal Inspection Service

Affidavit submitted by e-mail and attested to me as accurate by telephone consistent with Fed. R. Crim. Proc. 4(d), 4.1, and 41(d)(3) this ___11___ day of January, 2021

Honorable Thomas M. DiGirolamo
United States Magistrate Judge

32

## Attachment A:  The Target Premises

The property to be searched is 42 East Avenue, Apartment 1E, Hagerstown, Maryland, 21740 (hereinafter referred to as the "**Target Premises**").  The building containing the **Target Premises** is described as follows:  a three-story painted brick apartment building.  The front entry door to the building is glass with brown trim.  The number "42" is affixed to a porch column in the front of the building.

Photographs of the building containing the **Target Premises** are as follows:



The apartment door for the **Target Premises** is inside the building on the first floor.  The door to the **Target Premises** is brown with a glass window, and has a black metal mailbox on the front of the door with the label "APT 1E."

Photographs of the door to the **Target Premises** are as follows:



## Attachment B:  Items to be Seized From the Target Premises

This warrant authorizes the search and seizure of items relating to the violations of 21

U.S.C. §§ 841, 843(b), and 846, by Ivan Augustus Ransome and his known and unknown co-

conspirators, including, but not limited to, the following:

1.     Controlled substances.

2.     Records of narcotics transactions, including, but not limited to, books; ledgers; receipts; notes; pay and owe sheets; and other papers relating to the manufacture, transportation, possession, and distribution of controlled substances or the receipt and disposition of proceeds derived from the sale of illegal narcotics.

3.     Financial records and other documents reflecting narcotics-trafficking activity or the disposition of narcotics proceeds, including, but not limited to, financial instruments; stocks; bonds; bank checks; cashier's checks and receipts for such checks; Western Union receipts; money orders; money order receipts; credit card records; pre-paid credit cards; green dot cards; vehicle registrations; real estate records; income tax returns and any documentation relating to the payment of any income tax; mail and contract mail carrier records; documentation and receipts relating to any safe deposit boxes; keys to safe deposit boxes; documentation and receipts relating to any storage facilities; keys to those storage facilities; devices capable of counting large sums of currency; and any other documents or evidence of financial transactions involving the receipt and disposition of the proceeds of illegal narcotics sales.

4.      Records that identify other co-conspirators, including, but not limited to: address books; telephone books; rolodexes; telephone bills and records; records of telephone calls recorded in writing; notes reflecting telephone and pager numbers or papers which reflect names, addresses, and telephone numbers of suspected co-conspirators; photographs, including still photos, negatives, movies, slides, video tapes, and undeveloped film; and audiotape recordings of conversations, including those made over telephone answering machines.

5.     Records of travel including, but not limited to, tickets; transportation schedules; passports; automobile rental records; motel/hotel receipts; and any notes and other receipts related to travel.

6.     Indicia of occupancy, residency, rental, control, and/or ownership of the premises, including, but not limited to, keys; photographs; deeds; mortgages; lease agreements; rental receipts; canceled checks; bills; titles; and registration documents.

7.     Drug paraphernalia, including, but not limited to, digital scales; plastic bags; gel caps; vials; cutting agents (i.e. Mannitol and Quinine); metal pressing devices for compressing controlled substances; razors; kilogram wrappers; and other items used in the preparation and packaging of controlled substances.

8.      United States currency or currency equivalents.

9.      Suitcases; file cabinets; or other locked or unlocked containers; hidden compartments that may contain any of the items listed in Nos. 1 – 7; and the contents thereof.

10.     Locked or unlocked safes (and law enforcement officers may drill the same).

11.     Cellular telephones and related records; pagers and personal digital assistants and the numbers stored inside those devices; and devices capable of recording incoming telephone numbers and the numbers stored within those devices.

12.     With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable.  If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review.  The investigative team will take no further steps regarding any review of information so segregated absent further order of the court.  The investigative team may continue to review any information not segregated as potentially privileged.

**No electronic devices seized from the Target Premises will be searched until further authorization from the Court, and according to protocol approved by the Court.**

1:21-mj-356 TMD

# EXHIBIT 2

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Antoine Martel, Inspector, United States Postal Inspection Service ("USPIS"), being first duly sworn, hereby depose and state the following:

## INTRODUCTION AND AGENT'S BACKGROUND

1.     I make this Affidavit in support of a search and seizure warrant for each following locations:

   a.  2321 N. 39th Avenue, Phoenix, Arizona 85009, as further described in Attachment A-1, (hereinafter individually referred to as "**Target Location 1**") in order to search for and seize the items outlined in Attachment B-1, which represent evidence, fruits, and/or instrumentalities of drug trafficking activities, in violation of 21 U.S.C. §§ 841(a)(1), 843(b), and 846;

   b.  2323 N. 39th Avenue, Phoenix, Arizona 85009, as further described in Attachment A-2, (hereinafter individually referred to as "**Target Location 2**") in order to search for and seize the items outlined in Attachment B-2, which represent evidence, fruits, and/or instrumentalities of drug trafficking activities, in violation 21 U.S.C. §§ 841(a)(1), 843(b), and 846; and

   c.  2325 N. 39th Avenue, Phoenix, Arizona 85009, as fully described in Attachment A-3, (hereinafter individually referred to as "**Target Location 3**") in order to search for and seize the items outlined in Attachment B-3, which represent evidence, fruits, and/or instrumentalities of drug trafficking activities, in violation 21 U.S.C. §§ 841(a)(1), 843(b), and 846 (collectively referred to as the "**Target Locations**").

2.     I am a United States Postal Inspector with the United States Postal Inspection Service ("USPIS"), and have been since February 2019.  I am currently assigned to the Contraband Interdiction and Investigations ("CI2") team in the Phoenix (Arizona) division.

In that role, I help investigate individuals for narcotics violations involving the United States Mail. My other responsibilities include the detecting and preventing the transportation of narcotics through the United States mail. Among the areas that I have received training are narcotics investigations through the United States mail and investigative techniques. Specifically, based on my training and experience in investigating narcotics-related crimes, I know the following:

a. Narcotics trafficking is an ongoing and recurring criminal activity. As contrasted with crimes against persons, which tend to be discrete offenses, narcotics trafficking is an illicit commercial activity that is characterized by regular, repeated criminal activity.

b. Narcotics traffickers commonly compartmentalize members of their organization into discrete "cells," with specific members, responsibilities, and/or geographical territories assigned to each cell, and members of one cell commonly receive information only about that specific cell's criminal activities. Consequently, this limitation of information frustrates law enforcement efforts to dismantle the entire organization.

c. High-level narcotics traffickers commonly use multiple cellular telephones.

d. Cellular telephones are indispensable tools of the narcotics trafficking trade. Narcotics traffickers use cellular telephones, push-to-talk telephones, Short Message Service ("SMS"), electronic mail, and other, similar electronic means and/or devices to maintain contact with co-conspirators and other narcotics traffickers.

e. Drug trafficking organizations utilize the United States mail as a means of transporting narcotics and proceeds thereof to and from drug trafficking organization ("DTO") members. They use United States Priority Mail Express and Priority Mail services to ship narcotics and

bulk-cash narcotics proceeds through the United States mail.  Each United States Priority Mail Express and Priority Mail parcel has a distinct tracking number, and an individual with a tracking number can track the particular parcel online.  Packages shipped to or from narcotics source states—such as Arizona, California, Texas, Washington, Colorado, and Florida—or territories—such as Puerto Rico—can signify that the United States Priority Mail Express and Priority Mail parcels contain narcotics or the proceeds thereof.

3.      Additionally, based on my training, knowledge, and experience, I know that there are suspicious characteristics common to many packages that contain drugs and drug proceeds, and the USPIS uses such characteristics to identify packages requiring further investigation.  The most common suspicious characteristics routinely observed in the course of screening packages are as follows:

a.      As an alternative to First Class Mail, which does not provide a customer with the capability to track the progress of a parcel through the system, the United States Postal Service ("USPS") offers Priority Mail Express and Priority Mail services.  The Priority Mail Express service guarantees the delivery of the customer's package on a set date and time determined at the time of mailing but that package is usually scheduled for overnight delivery.  The customer receives a receipt containing the guaranteed delivery date along with a distinct Priority Mail Express tracking number and can opt for a signature requirement at the other end. The customer can track the parcel online by its distinct tracking number, and if the package is not delivered by the promised time, the customer is entitled to a refund for the mailing cost of that package.  Unlike the Priority Mail Express service, the Priority Mail service has a delivery standard of one to three business days, and delivery within that time period is not guaranteed.  Although the Priority Mail service is a less expensive alternative to the Priority Mail Express service, the

Priority Mail service still provides tracking capabilities.   In your Affiant's experience, it is fairly easy to separate out smaller parcels, which constitute 70% to 80% of all Priority Mail Express and Priority Mail parcels, from other heavier parcels.  Legitimate businesses using the Priority Mail Express and Priority Mail services typically have a business or corporate account visible on the mailing labels with typewritten addresses, which cover the mailing cost of those parcels.  Priority Mail Express parcels shipped by legitimate businesses typically weigh no more than eight ounces, and Priority Mail parcels shipped by the same, typically weigh no more than two pounds.  In contrast, a drug distributor will pay for the mailing cost of a package containing drugs or drug proceeds at the counter by using cash or a credit card.  Drug packages usually exceed the typical weights of Priority Mail Express and Priority Mail shipped by legitimate businesses, and the mailing labels on the drug packages are typically hand written.  Typically, drug traffickers use Priority Mail Express and will opt out of the requirement of obtaining a signature upon delivery.

b.  Invalid Sender/Return Address:  When drug traffickers ship drugs through the mail, the senders generally do not want the drugs back.  To distance themselves from parcels containing drugs, drug traffickers often list fictitious or false return addresses and names of senders.  A fictitious or false address is anything from an incorrect zip code to a non-existent house number or street.  Likewise, the senders' names are sometimes names of celebrities, cartoon characters, or fictional names.  More often, a search of a law enforcement database reflects that there is no association between the name of the sender and the address provided.

c.  Invalid Recipient/Address:   While putting the wrong receiving address on a package would be counter-productive, the named recipient often is not associated with the receiving address.  Consequently, the intended recipient of the package can claim that he did not know about its contents.  Drug traffickers sometimes address drug packages to vacant properties with the expectation that the

4

postal carrier will leave them at the receiving address. The intended recipient of packages containing drugs or proceeds of the same will then retrieve them from that location and hope to remain anonymous.

      d.   Location of Sender: Packages shipped to or from narcotics source states, such as Arizona, California, Texas, Washington, Colorado, and Florida, or territories, such as Puerto Rico, can also signify that the parcels contain controlled substances or the proceeds thereof.

      e.   Smell: The odors of cocaine, marijuana, and methamphetamine are distinct, and postal inspectors are familiar with these odors from experience. On occasion, a parcel will emit an odor that is easily recognized without the assistance of a canine. Other smells suggesting that a parcel may contain narcotics include the aroma of masking agents. Among the common masking agents used to thwart law enforcement detection are dryer sheets, coffee, and mustard.

      f.   Heavy Taping/Excessive Glue: Drug traffickers heavily tape or use excessive glue on narcotics parcels in an effort to keep the smell inside and forestall easy checking on the interior contents by lifting up a flap.

      g.   Click-N-Ship: The USPS created Click-N-Ship as a service for frequent mailers and businesses who prefer printing address labels and purchasing postage from their residences or businesses. Drug traffickers create Click-N-Ship accounts as a means of giving a legitimate appearance to their drug mailings. They create the accounts using fictitious account information and often provide pre-paid credit cards as forms of payment, which are difficult for law enforcement to track. Drug traffickers often use legitimate business return addresses in states other than California and Arizona as a means to deter detection, as states other than California and Arizona are not considered "source states."

    4.   The statements contained in this Affidavit are based upon my personal knowledge and observations; review of documents and other evidence; intercepted communications; and conversations with other law enforcement officers and other

individuals, who have personal knowledge of the events and circumstances described herein.

5.      Because I submit this affidavit for the limited purpose of establishing probable cause for the requested search warrants, I have not included every detail, or every aspect, of the investigation.  Rather, I have set forth only those facts that I believe are necessary to establish probable cause.

## PROBABLE CAUSE

*Background Information*

6.      This is an Organized Crime Drug Enforcement Task Force investigation targeting narcotics traffickers in several states, including Arizona, Maryland, New York, and Ohio.

7.      Based on the evidence gathered during the course of this investigation thus far, investigators believe that the Carlyle Lavar Alvarez ("**C. ALVAREZ**") Drug Trafficking Organization ("**DTO**") supplies others with narcotics—including, but not limited to, wholesale quantities of fentanyl, disguised as Oxycodone pills—through the United States mail.  Among the **C. ALVAREZ DTO** members who have shipped or assisted with the shipment of suspected narcotics parcels to others through the United States mail include Antoine Anthony Alvarez ("**A. ALVAREZ**"), who is **C. ALVAREZ**'s brother; Jennifer Jean Gann ("**GANN**"), who is **C. ALVAREZ**'s significant other; and Millie Anne Reyes ("**REYES**"), who is believed to be **A. ALVAREZ**'s significant other. Investigators have identified approximately eighty (80) suspicious Priority Mail Express and Priority Mail parcels mailed through the USPS from Arizona to addresses in other states between February 2020 and December 2020.  Investigators have seized several of those Priority Mail Express parcels, and the aggregate amount of pills containing fentanyl is approximately 5,161 pills, weighing approximately 562 grams.

8.      On October 22, 2020, Honorable Stephanie A. Gallagher of the United States District Court for the District of Maryland authorized the initial interception of wire and electronic communications occurring over, inter alia, (i) the cellular telephone assigned

call number (602) 551-4243 ("**Target Telephone 1**"), which is used by **C. ALVAREZ**;[1] and (ii) the cellular telephone assigned call number (480) 283-3767 ("**Target Telephone 2**"), which is also used by **C. ALVAREZ**[2] (collectively referred to as the "Initial Wiretap").

9.    On or about October 30, 2020, investigators installed a pole camera positioned in the area of **Target Location 1**.

10.    On December 2, 2020, Judge Gallagher authorized, inter alia, the renewed interception of wire communications only occurring over **Target Telephone 2** (hereinafter referred to as the "Second Wiretap").

11.    As part of the Court Order authorizing the Second Wiretap, Judge Gallagher authorized the collection of GPS, latitude-longitude data, and other precise location information (hereinafter referred to as "GPS/PLI data") for **Target Telephone 2**.    On December 3, 2020, law enforcement began receiving GPS/PLI data for **Target Telephone 2**.

12.    Law enforcement has ceased interception communications occurring over the Initial Wiretap and the Second Wiretap.

13.    On December 19, 2020, at approximately 1:19 a.m. (EST), four days after investigators conducted the controlled delivery as detailed *infra* Paragraphs 43-46, investigators stopped receiving pings from **Target Telephone 2**.    Likewise, as of December 18, 2020, there were no longer communications occurring **Target Telephone**

---

[1] Investigators were able to determine that **C. ALVAREZ** used **Target Telephone 1** based on the following:  Investigators (1) determined that the Arizona driver's license photograph of Carlyle Lavar Alvarez and the CCTV footage of the suspected mailer of suspicious packages discussed *infra* are the same person: **C. ALVAREZ**; (2) confirmed through Wal-Mart money transfer transaction records that the contact telephone number listed for **C. ALVAREZ** was **Target Telephone 1** and video surveillance footage associated with Walmart money transfer transaction showed **C. ALVAREZ**; and (3) know through their training, knowledge, and experience that high-level drug traffickers use multiple cellular telephones.

[2] Carlyle Alvarez is listed as the subscriber for **Target Telephone 2**.

**2.**     Based on investigators' training, knowledge, and experience, including their involvement in this investigation, investigators believe that **C. ALVAREZ** dropped **Target Telephone 2** after learning about the December 15, 2020 controlled delivery.

14.     On January 11, 2021, Honorable Thomas M. DiGirolamo, United States Magistrate Judge for the District of Maryland, issued criminal complaints regarding, in part, the conduct detailed *infra*.  The criminal complaints charge **C. ALVAREZ** with conspiracy to distribute and possess with intent to distribute fentanyl and cocaine; **GANN** with conspiracy to distribute and possess with intent to distribute fentanyl; and Shanavia Middleton ("**MIDDLETON**"), **REYES**, and **A. ALVAREZ** with conspiracy to distribute and possess with intent to distribute cocaine.  On the same day, Magistrate Judge DiGirolamo issued arrest warrants for, inter alia, **C. ALVAREZ**, **GANN**, **MIDDLETON**, **REYES**, and **A. ALVAREZ**.

*Target Location 1*

15.     On August 1, 2020, **C. ALVAREZ** signed a month-to-month rental lease for **Target Location 1**.  Both **C. ALVAREZ** and **GANN** live at **Target Location 1**.

16.     USPS records reflect that mail was addressed to **GANN** and listed **Target Location 1** as **GANN**'s address.

17.     Investigators have observed **C. ALVAREZ** enter and exit **Target Location 1** on several occasions.  As recent as January 9, 2021, investigators observed **C. ALVAREZ** exit and enter **Target Location 1**.

18.     Similarly, investigators have observed **GANN** enter and exit **Target Location 1** on several occasions.  As recent as January 9, 2021, investigators observed **GANN** exit and enter **Target Location 1**.

19.     On a number of occasions investigators observed **C. ALVAREZ** and **GANN** leave **Target Location 1** and, within a short time window, mail suspected narcotics parcels.

20.     Specifically, November 3, 2020, at approximately 1:45 p.m. (MST), investigators observed **C. ALVAREZ**, carrying what appeared to be a plastic shopping

8

bag, and **GANN** exit **Target Location 1**.   **GANN** entered the driver seat and **C. ALVAREZ** entered the front passenger seat of a silver 2014 Infiniti Q50, bearing Arizona license plate number CJF5249 and vehicle identification number JN1BV7AP4EM684763, registered to **GANN** and **C. ALVAREZ** (hereinafter referred to as "**GANN** and **C. ALVAREZ's Vehicle**").  Shortly after, **GANN**, the vehicle away from **Target Location 1**.

21.     Investigators followed **GANN** and **C. ALVAREZ's Vehicle**, but they eventually lost sight of it during surveillance.  However, at approximately 2:48 p.m. (MST), GPS/PLI data reflected that **Target Telephone 1** was in the area of 8155 N. Canyon Highway, Phoenix, Arizona, 85021.

22.     Investigators traveled to the Washington Post Office located at 8155 N. Canyon Highway, Phoenix, Arizona 85021 ("Washington Post Office") and observed **GANN** and **C. ALVAREZ's Vehicle** parked in the Washington Post Office's parking lot. Your Affiant observed **C. ALVAREZ** at the USPS customer counter of the Washington Post Office.

23.     **GANN** mailed a Priority Mail Express parcel to 410 Locust Street, Apartment 102, Akron, Ohio, 44307 with the following characteristics: (1) a return address in Phoenix, Arizona; (2) no association between sender's and recipient's last name and addresses; and (3) weighed approximately five ounces (hereinafter referred to as "**Ohio Package 1**").  Shortly after **GANN** mailed **Ohio Package 1**, **C. ALVAREZ** mailed a Priority Mail Express parcel to 126 Clifton Place, Apartment 1008, Jersey City, New Jersey, 07304, with the following characteristics: (1) a return address in Phoenix, Arizona; (2) no association between the sender's and recipient's names and addresses; and (3) weighed approximately five ounces (hereinafter referred to as "**New Jersey Package 1**").

24.     On November 5, 2020, United States Magistrate Judge Burke issued a warrant, authorizing the search of **Ohio Package 1** (hereinafter referred to as the "November 5, 2020 warrant").  On the same day, investigators searched **Ohio Package 1** pursuant to the November 5, 2020 warrant and recovered 200 light blue/green pills,

containing fentanyl and weighing approximately 21 grams in the aggregate, from inside **Ohio Package 1**. Of note, those pills bear "M" as an impression marking on one side of them and the number "30" as an impression marking on the other side of them.

25. On November 6, 2020, Honorable Michael T. Morrissey, United States Magistrate Judge for the District of Arizona, issued a warrant, authorizing the search of **New Jersey Package 1** (hereinafter referred to as the "November 6, 2020 warrant"). On the same day, Arizona Postal Inspectors searched **New Jersey Package 1** and recovered approximately 200 light green pills—that field-tested positive for Acetaminophen—from inside **New Jersey Package 1** pursuant to the November 6, 2020 warrant. Of note, those pills bear "M" as an impression marking on one side of them and the number "30" as an impression marking on the other side of them. Based on training and experience, your Affiant knows that counterfeit Oxycodone pills containing fentanyl often also contain Acetaminophen, and field-testing may only show positive for Acetaminophen, but lab testing will later reveal the presence of fentanyl. The lab testing for those pills is pending.

26. As recent as December 5, 2020, between approximately 12:37 p.m. and 12:40 p.m. (MST), **C. ALVAREZ** mailed two Priority Mail Express parcels from the Phoenix PDC Post Office located at 4949 E. Van Buren Street, Phoenix, Arizona, 85026 (hereinafter referred to as "Phoenix PDC Post Office"). The Priority Mail Express parcel destined for 3715 Kings Highway, Apartment 3J, Phoenix, Brooklyn, New York, 11234 had the following characteristics: (1) a return address in Phoenix, Arizona; (2) no association between the sender's and recipient's names and addresses; and (3) weighed approximately six ounces (hereinafter referred to as "**New York Package 1**"). The Priority Mail Express parcel destined to 47 McKeever Place, Apartment 7A, Brooklyn, New York, 11225 had the following characteristics: 1) a return address in Phoenix, Arizona; (2) no association between the sender's and recipient's names and addresses; and (3) weighed approximately five ounces (hereinafter referred to as "**New York Package 2**").

27.     According to USPS records, **New York Package 1** and **New York Package 2** were delivered on December 6, 2020, at approximately 10:58 a.m. and 11:58 a.m. (EST), respectively.

28.     Based on the previous narcotics seizures from Priority Mail Express parcels with listed senders' and recipients' names that were not associated with listed addresses during this investigation, in addition to investigators' training, knowledge, and experience, including their involvement in this investigation, investigators believe that **New York Package 1** and **New York Package 2** contained narcotics.

29.     GPS/PLI data for **Target Telephone 2** reflects that, on December 5, 2020, from at least approximately 3:29 a.m. (MST), until approximately 12:02 p.m. (MST), **Target Telephone 2** pinged at the same general location, which was in the vicinity of **Target Location 1**.  GPS/PLI data for **Target Telephone 2** further reflects that, on the same day, at approximately 12:37 p.m. (MST), **Target Telephone 2** was located in the direct vicinity of the Phoenix PDC Post Office.  GPS/PLI data for **Target Telephone 2** also reflects that, on the same day, at approximately 1:12 p.m. (MST), **Target Telephone 2** pinged in the vicinity of **Target Location 1**.

30.     **Target Location 1** is approximately 11.6 miles from Phoenix PDC Post Office.

31.     Based on information obtained during the course of this investigation, including a previous instance of **GANN** and **C. ALVAREZ** traveling directly from **Target Location 1** to a post office to mail narcotics or suspected narcotics, as well as investigators' training, knowledge, and experience, they believe that **C. ALVAREZ** traveled from **Target Location 1** to the Phoenix PDC to mail **New York Package 1** and **New York Package 2**, and then **C. ALVAREZ** returned to **Target Location 1** following the mailing of **New York Package 1** and **New York Package 2**.

\\\

\\\

\\\

11

*Target Location 2*

32.     On August 1, 2020, Maria Alvarez ("**M. ALVAREZ**), the mother of **C. ALVAREZ and A. ALVAREZ,** signed a rental lease for **Target Location 2**.   **M. ALVAREZ** lives at **Target Location 2**.

33.     **M. ALVAREZ** has mailed suspected narcotics parcels during this investigation as discussed *infra* Paragraphs 54-57.

34.     During the Second Wiretap, investigators learned about an approximately two kilogram quantity of cocaine transaction involving **C. ALVAREZ** and Shanavia Middleton ("**MIDDLETON**") as well as the shipment of the same involving **A. ALVAREZ** and **REYES**.

35.     On December 7, 2020, at approximately 4:43 p.m. (MST), **C. ALVAREZ**, via **Target Telephone 2**, received an incoming call from **MIDDLETON**, via (602) 367-0956.[3] Here is an excerpt of their discussion:

**MIDDLETON**: Yeah, what I was trynna [sic] say, Chi, call your boy to see if he's good because I'm trynna fuck with these niggas. These niggas got me stressed out over that little two-fifty (250), you know?

**C. ALVAREZ**: Yeah. [BACKGROUND: UC VOICE][VOICES OVERLAP].

**MIDDLETON**: Damn, man. Let's see if we got options. 'Cause if it wasn't for homie I wouldn't even be ready, you know?

**C. ALVAREZ**: Yeah.

**MIDDLETON**: Yeah, let's see if they- if they Gucci. Let's see if- what they number-if not...

**C. ALVAREZ**: Alright, I'm wondering if I could call now.

**MIDDLETON**: And yeah, two (2). Just see what the number is or, you know?

**C. ALVAREZ**: Yeah. [VOICES OVERLAP]

---

[3] As discussed *infra* Paragraph 46, law enforcement seized the cellular telephone assigned call number (602) 367-0956 that belonged to **MIDDLETON** from the couch on the ground floor of the **New York Packages**' delivery address.

**MIDDLETON**: I don't really wanna [sic] deal with them with these numbers they talkin' 'bout. They not playing fair. These niggas not respecting every time I come, I'm coming up more, more, and more, you know?

**C. ALVAREZ**: [BACKGROUND: UC VOICE] Yeah.

**MIDDLETON**: Ain't respecting shit, so. [PAUSE] Let's check. But, I'm here, bro'.

**C. ALVAREZ**: A'ight.

Based on investigators' training, knowledge, and experience, including their experience in this investigation, investigators believe that, in vague, coded language, (1) **MIDDLETON** (i) asked **C. ALVAREZ** to contact narcotics suppliers for quotes for the narcotics that **MIDDLETON** wanted to purchase for distribution; and (ii) **MIDDLETON** expressed her dissatisfaction with the price quoted for the amount of narcotics that **MIDDLETON** was purchasing—(*i.e.*, "I don't really wanna [sic] deal with them with these numbers they talkin' bout. They not playing fair."); and (iii) **MIDDLETON** believed she should receive a lower price for the narcotics due to **MIDDLETON** continually purchasing additional narcotics—(*i.e.*, "I'm coming up more, more, and more"); and (2) **C. ALVAREZ** agreed to do as **MIDDLETON** requested.

36.     On December 7, 2020, at approximately 4:50 p.m. (MST), **C. ALVAREZ**, via **Target Telephone 2**, made an outgoing telephone call to **MIDDLETON**, via (602) 367-0956. Here is an excerpt of their discussion:

**C. ALVAREZ**: Uh, I'm waiting for a call back from the homie and then I just finished speaking to uh, Ice Cream Man.

**MIDDLETON**: And what he talkin' 'bout?

**C. ALVAREZ**: He said thir- he said thirty-four (34). He know for sure it's- it's- it's a hundred (100%) percent- it's a hundred (100%) percent- it could float and it could melt. [VOICES OVERLAP]

**MIDDLETON**: That's what we gotta [sic] make sure, 'cause that's what these niggas think- that somebody on them that like- yo, I'm telling you, I'm a little mad. I'm stressed, bro'. Super stressed, but I'm with you, you know?

13

**C. ALVAREZ**: Yeah.

**MIDDLETON**: Yeah, I tell- I gotta chop it with you, soon as I pull up.

Based on investigators' training, knowledge, and experience, including their experience during the course of this investigation, investigators believe that **C. ALVAREZ**, in vague, coded language, (i) confirmed with **MIDDLETON** that **C. ALVAREZ** spoke with a narcotics supplier, who provided a quote—(*i.e.*, thirty-four)— for the narcotics that **MIDDLETON** wanted to purchase for distribution; and (ii) confirmed the quality of those narcotics—(*i.e.*, "it could float and it could melt."). Based on investigators' training, knowledge, and experience, including their experience during the course of this investigation, investigators further believe that **MIDDLETON** stated that **MIDDLETON** and **C. ALVAREZ** (i) must ensure that those narcotics are of the quality that they desired—(*i.e.*, "That's what we gotta [sic] make sure"); and (ii) will discuss **MIDDLETON** and **C. ALVAREZ**'s narcotics trafficking activities further in person— (*i.e.,* "I gotta chop it with you, soon as I pull up.").

37. On December 9, 2020, pole camera footage reflects that, between approximately 12:41 and 12:43 p.m. (MST), **REYES** and **A. ALVAREZ** exited **Target Location 2**, entered a dark sedan, and drove away from **Target Location 2**. The pole camera footage further reflects that, a little over thirty minutes later, (i) the dark sedan (a) returned and (b) was parked in the shared driveway of **Target Location 2** and **Target Location 3**; and (ii) **REYES** and **A. ALVAREZ** exited the dark sedan. The pole camera footage also reflects that **A. ALVAREZ** (i) subsequently removed at least two empty brown boxes from the passenger area of dark sedan; and (ii) carried the empty brown boxes into **Target Location 2**.

38. On the same day, pole camera footage reflects that, between approximately 1:45 p.m. and 1:48 p.m. (MST), **A. ALVAREZ**, carried two boxes, and **REYES**, carried one box from the area of **Target Location 2** to a dark sedan parked on the west side of **Target Location 2**, and placed those boxes into the dark sedan. The pole camera footage further reflects that, on the same day, at approximately 1:48 p.m. (MST), **MIDDLETON**

14

exited **Target Location 2**, **A. ALVAREZ**, **REYES**, and **MIDDLETON** eventually entered the dark sedan, and the dark sedan departed from the west side of **Target Location 2**.

39.     At approximately 2:07 p.m. (MST), **REYES**, carrying two boxes, and **A. ALVAREZ**, carrying one box, entered the Osborn Post Office located at 3905 North Seventh Avenue, Phoenix, Arizona 85013 ("Osborn Post Office").

40.     Additionally, between approximately 2:31 p.m. (MST) and 2:39 p.m. (MST), **REYES** handed two Priority Express Mail parcels destined for 116-50 Lincoln Street, South Ozone Park, New York, 11420 (hereinafter referred to as the "**New York Packages**") to a USPS associate at the transaction counter for shipment and paid shipping costs of the **New York Packages** in cash; and (ii) **A. ALVAREZ** obtained the change from that cash transaction.

41.     During the Second Wiretap, **C. ALVAREZ** followed up on the **New York Packages**. For instance, on December 11, 2020, at approximately 2:13 p.m. (MST), **C. ALVAREZ**, via **Target Telephone 2**, made an outgoing call to **MIDDLETON**, via (602) 367-0956. Here is an excerpt of their discussion:

> **C. ALVAREZ**: That shit in hand?
>
> **MIDDLETON**: Nah, it's- it's still saying, it ain't say, "Out for delivery," yet. It- it say it's on that side, though.

Based on information obtained during the course of this investigation, as well as investigators' training, knowledge, and experience, investigators believe in vague coded language (i) **C. ALVAREZ** called **MIDDLETON** to determine if the **New York Packages** had been delivered, *i.e.*, "That shit in hand"); and (ii) **MIDDLETON** (a) confirmed that the **New York Packages** had not been delivered; and (b) indicated that **MIDDLETON**, or someone at **MIDDLETON's** direction, checked the **New York Packages'** delivery status.

42.     On December 14, 2020, Honorable Lois Bloom, United States Magistrate Judge for the Southern District of New York, issued a warrant, authorizing the search of the **New York Packages** (hereinafter referred to as the "December 14, 2020 warrant").

15

On the same day, Postal Inspectors searched the **New York Packages** pursuant to the December 14, 2020 warrant and recovered approximately one kilogram of cocaine in each of the **New York Packages**.

43.     On December 15, 2020, United States Magistrate Judge Bloom issued two warrants—one, authorizing the tracking of the **New York Packages** ("December 15, 2020 tracking warrant"); and two, authorizing the search of premises in which the **New York Packages** were opened ("December 15, 2020 residential warrant"). Later on the same day, at approximately 4:12 p.m. (EST), USPIS, Homeland Security Investigations, and the New York City Police Department conducted a controlled delivery at the **New York Packages'** delivery address. During the delivery, a USPIS Inspector, working in an undercover capacity, delivered the **New York Packages** to **MIDDLETON** at the front door of the **New York Packages'** delivery address, although **MIDDLETON** does not rent or own the residence.

44.     After receiving an alert from one of the trip devices installed inside of the **New York Packages**, pursuant to the December 15, 2020 tracking warrant, law enforcement entered the **New York Packages'** delivery address pursuant to the December 15, 2020 residential warrant. During the December 15, 2020 residential warrant execution, **MIDDLETON** was located on the ground floor.

45.     Law enforcement confirmed that one of the **New York Packages** was open.

46.     Among the items that law enforcement seized was a black Samsung Galaxy, Model No. SM-A015AZ, bearing IMEI No. 351721112380809, belonging to **MIDDLETON** ("**MIDDLETON's cellphone**") from the **New York Packages'** delivery address.

47.     On December 29, 2020, Magistrate Judge DiGirolamo issued a warrant authorizing the search of **MIDDLETON's cellphone**.

48.     During a search of **MIDDLETON's cellphone**, investigators learned that **MIDDLETON's** cellphone is assigned the cellular telephone assigned call number (602) 367-0956.

16

49.     Investigators also discovered during the search of **MIDDLETON's cellphone** that, (i) at approximately 1:08 p.m. MST, on the day immediately after **C. ALVAREZ** followed up with **MIDDLETON** about **New York Packages'** delivery status, **REYES**, via (843) 694-9763,[4] provided **MIDDLETON**, via (602) 367-0956, with a photograph of the USPS receipt containing the tracking numbers for the **New York Packages**; and (ii), on December 15, 2020, at approximately 10:22 a.m. (MST), **REYES**, via (843) 694-9763, sent the following instant message to **MIDDLETON**, via (602) 367-0956: "Good morning, says out for delivery." Based on investigators' training, knowledge, and experience, including their involvement in this investigation, they believe that **REYES** alerted **MIDDLETON** that the **New York Packages** containing approximately two kilograms of cocaine would be delivered that day.

50.     Investigators further learned, on December 15, 2020, at approximately 2:46 p.m. (MST) that **MIDDLETON** received an incoming call from **A. ALVAREZ**, via (602) 644-6144,[5] lasting for 0 seconds. Based on investigators' training, knowledge, and experience, including their involvement in this investigation, they believe that, based on the timing of the communication, **A. ALVAREZ** contacted **MIDDLETON** to follow up about **MIDDLETON's** receipt of the **New York Packages** containing approximately two kilograms of cocaine.

---

[4] Investigators were able to determine that **REYES** used (843) 694-9763 based on the following: (1) Investigators determined that a comparison of the Arizona driver's license photograph of Millie Reyes, as well as other information obtained during the course of this investigation, and the image from CCTV footage of the **New York Packages'** mailer discussed *supra* are the same person: **REYES**; (2) **MIDDLETON's cellphone** received a photograph of the USPS receipt containing the tracking numbers for the **New York Packages**; and (3) (843) 694-9763 is listed under Millie, the first name of **REYES**, in **MIDDLETON's cellphone.**

[5] A Square, Inc. subpoena return for an account maintained by **A. ALVAREZ** identified (602) 644-6144 as the telephone number for **A. ALVAREZ.**

51.     Based on information obtained during the course of this investigation, as well as their training, knowledge, and experience, investigators believe that **MIDDLETON** (i) traveled to Phoenix, Arizona, to coordinate a multi-kilogram cocaine transaction; (ii) was the intended recipient of the approximately two kilograms of cocaine seized from the **New York Packages**; and (iii) was at the **New York Packages'** delivery address to (a) oversee the **New York Packages'** delivery; and (b) take custody of the approximately two kilograms of cocaine that were originally inside of the **New York Packages**.

*Target Location 3*

52.     On May 1, 2020, **A. ALVAREZ** signed a rental lease for **Target Location 3**. Both **A. ALVAREZ** and **REYES** live at **Target Location 3**.

53.     USPS records reflect that mail was addressed to **REYES** and listed **Target Location 3** as **REYES'** address.

54.     On July 29, 2020, at approximately 9:42 a.m. (MST), **M. ALVAREZ**, driving **GANN and C. ALVAREZ's Vehicle**, stopped at **Target Location 3**; exited **GANN and C. ALVAREZ's Vehicle**; and entered **Target Location 3**.

55.     On the same day, at approximately 11:15 a.m., investigators observed **M. ALVAREZ**, carrying a shopping bag, depart **Target Location 3**; enter **GANN and C. ALVAREZ's Vehicle**; and drive **GANN and C. ALVAREZ's Vehicle** directly to the Maryvale Post Office located at 4415 N. Maryvale Parkway, Phoenix, Arizona 85031 ("Maryvale Post Office").

56.     While at the Maryvale Post Office, **M. ALVAREZ** mailed two Priority Mail parcels—one, destined to 995 Gates Avenue, Apartment 104B, Brooklyn, New York 11221, with the following characteristics: (1) a return address in Phoenix, Arizona; (2) no association between the sender's and recipient's names and their listed addresses; and (3) weighed approximately 3 ounces (hereinafter "**New York Package 3**"); and the other destined for 22 Park Street, East Stroudsburg, Pennsylvania 18301, with the following characteristics: (1) a return address in Phoenix, Arizona; (2) no association between the

sender's name and their listed address; and (3) weighed approximately 5 ounces (hereinafter "**Pennsylvania Package 1**").

57.    **New York Package 3** was delivered on August 1, 2020, at approximately 2:59 p.m. (EST), and **Pennsylvania Package 1** was delivered on August 6, 2020, at approximately 11:06 a.m. (EST).

58.    Based on the previous narcotics seizures from Priority Mail Express parcels with listed senders' and recipients' names that were not associated with listed addresses during this investigation, in addition to investigators' training, knowledge, and experience, including their involvement in this investigation, investigators believe that (1) **New York Package 3** and **Pennsylvania  Package 1** contained narcotics.

59.    Investigators have observed **A. ALVAREZ** enter and exit **Target Location 3** on several occasions.  As recent as January 9, 2021, investigators observed **A. ALVAREZ** exit and enter **Target Location 3**.

60.    Similarly, investigators have observed **REYES** enter and exit **Target Location 3** on several occasions.  As recent as January 10, 2021, investigators observed **REYES** exit and enter **Target Location 3**.

### III.    ITEMS TO BE SEIZED

61.    Based upon the facts contained in this Affidavit, I submit that there is probable cause to believe that the items listed in ·Attachments B-1, B-2, and B-3 will be found at the **Target Locations**.

62.    Based on my training, education, and experience, and discussions with other trained law enforcement personnel, along with information provided by sources of information and confidential sources, your Affiant knows the following:

   a.    Drug traffickers often keep large amounts of United States currency on hand in order to maintain and finance their ongoing trafficking activities.  Traffickers commonly maintain such currency where they have ready access to it, such as in their homes and vehicles. It is also common for traffickers to possess drug proceeds and items purchased with proceeds in their homes and vehicles. Thus, it is common for currency,

expensive jewelry, precious metals, or financial instruments to be found in the possession of drug traffickers.

      b.    Traffickers often maintain paraphernalia for manufacturing and distributing controlled substances, including packaging materials, scales, and cutting agents. Traffickers commonly maintain such paraphernalia at stash houses, in their homes, or in their vehicles.

      c.    Traffickers often maintain paper records of their drug trafficking and money laundering activities. Your Affiant knows that such records are commonly maintained for long periods of time and therefore are likely to be found at the **Target Locations**.

      d.    Drug traffickers commonly use computers, cellular telephones, and other electronic devices to communicate with other drug traffickers and customers about drug-related activities through the use of telephone calls, text messages, email, chat rooms, social media, and other internet- and application-based communication forums. Moreover, drug traffickers commonly use other capabilities of computers and electronic devices to further their drug trafficking activities. Therefore, evidence related to drug trafficking activity is likely to be found on electronic storage media found at the **Target Locations**, as further described below.

      e.    In addition to items which may constitute evidence, fruits and/or instrumentalities of the crimes set forth in this Affidavit, your Affiant also requests permission to seize any articles tending to establish the identity of persons who have dominion and control over the **Target Locations**, including rent receipts, utility bills, telephone bills, addressed mail, personal identification, keys, purchase receipts, sale receipts, photographs, vehicle pink slips, and vehicle registration.

## CONCLUSION

    63.    Your Affiant submits there is probable cause to believe that the items listed in Attachments B-1, B-2, and B-3, which constitute evidence, fruits, and/or

instrumentalities of 21 U.S.C. §§ 841(a)(1), 843(b), and 846 are likely to be found at the **Target Locations**, which are further described in Attachments A-1, A-2, and A-3.


Antoine Martel   <small>Digitally signed by Antoine Martel<br>Date: 2021.01.12 13:23:04 -07'00'</small>
_____
Antoine Martel, Inspector
U.S. Postal Inspection Service

Subscribed and sworn telephonically this _12th_ day of January, 2021 @ 5:27pm

_____
HONORABLE DEBORAH M. FINE
United States Magistrate Judge

## Attachment A-1:  Target Location 1

The property to be searched is 2321 N. 39th Avenue, Phoenix, Arizona 85009 (hereinafter referred to as "**Target Location 1**").  **Target Location 1** is described as follows:  a single story southern facing, brown painted block house with white trim and brown shingle roof.  The front entry door to the building is located at the center of the building and is an inward opening white panel door with an outward opening black metal security screen door, to the west of the front door is a large window facing south with painted metal bars affixed, and to the east of the front door is another smaller window facing south with painted metal bars affixed.  The number "2321" is affixed to the left (western) porch column in the front of the building, facing south towards Encanto Boulevard.

Photographs of **Target Location 1** are as follows:



1:21-mj-356 TMD



## Attachment B-1:  Items to be Seized From the Target Premises

This warrant authorizes the search and seizure of all records relating to the violations of 21 U.S.C. §§ 841, 843(b), and 846, by Carlyle Lavar Alvarez, Jennifer Jean Gann, and their known and unknown co-conspirators, including, but not limited to, the following:

1.    Records of narcotics transactions, including, but not limited to, books; ledgers; receipts; notes; pay and owe sheets; and other papers relating to the manufacture, transportation, possession, and distribution of controlled substances or the receipt and disposition of proceeds derived from the sale of illegal narcotics.

2.    Financial records and other documents reflecting narcotics-trafficking activity or the disposition of narcotics proceeds, including, but not limited to, financial instruments; stocks; bonds; bank checks; cashier's checks and receipts for such checks; Western Union receipts; money orders; money order receipts; credit card records; pre-paid credit cards; green dot cards; vehicle registrations; real estate records; income tax returns and any documentation relating to the payment of any income tax; mail and contract mail carrier records; documentation and receipts relating to any safe deposit boxes; keys to safe deposit boxes; documentation and receipts relating to any storage facilities; keys to those storage facilities; devices capable of counting large sums of currency; and any other documents or evidence of financial transactions involving the receipt and disposition of the proceeds of illegal narcotics sales.

3.    Records that identify other co-conspirators, including, but not limited to: address books; telephone books; rolodexes; telephone bills and records; records of telephone calls recorded in writing; notes reflecting telephone and pager numbers or papers which reflect names, addresses, and telephone numbers of suspected co-conspirators; photographs, including still photos, negatives, movies, slides, video tapes, and undeveloped film; and audiotape recordings of conversations, including those made over telephone answering machines.

4.    Records of travel including, but not limited to, tickets; transportation schedules; passports; automobile rental records; motel/hotel receipts; and any notes and other receipts related to travel.

5.    Indicia of occupancy, residency, rental, control, and/or ownership of the premises, including, but not limited to, keys; photographs; deeds; mortgages; lease agreements; rental receipts; canceled checks; bills; titles; and registration documents.

6.    Drug paraphernalia, including, but not limited to, digital scales; plastic bags; gel caps; vials; cutting agents (i.e. Mannitol and Quinine); metal pressing devices for compressing controlled substances; razors; kilogram wrappers; and other items used in the preparation and packaging of controlled substances.

7.    United States currency or currency equivalents.

8.     Suitcases; file cabinets; or other locked or unlocked containers; hidden compartments that may contain any of the items listed in Nos. 1 – 7; and the contents thereof.

9.     Locked or unlocked safes (and law enforcement officers may drill the same).

10.    Cellular telephones and related records; pagers and personal digital assistants and the numbers stored inside those devices; and devices capable of recording incoming telephone numbers and the numbers stored within those devices.

## Attachment A-2:  Target Location 2

The property to be searched is 2323 N. 39th Avenue, Phoenix, Arizona 85009 (hereinafter referred to as "**Target Location 2**").  **Target Location 2** is described as follows: a single story southern facing, brown painted block house with white trim and brown shingle roof.  The front entry door to the building is located at the center of the building and is an inward opening white panel door with an outward opening black metal security screen door, to the east of the front door is a large window facing south with painted metal bars affixed, and to the west of the front door is another smaller window facing south with painted metal bars affixed.  The number "2323" is affixed to the center porch column in the front of the building, facing south towards Encanto Boulevard.

Photographs of **Target Location 2** are as follows:





## Attachment B-2:  Items to be Seized From the Target Premises

This warrant authorizes the search and seizure of all records relating to the violations of 21 U.S.C. §§ 841, 843(b), and 846, by Antoine Anthony Alvarez, Millie Ann Reyes, and Shanavia Middleton, and their known and unknown co-conspirators, including, but not limited to, the following:

1.    Records of narcotics transactions, including, but not limited to, books; ledgers; receipts; notes; pay and owe sheets; and other papers relating to the manufacture, transportation, possession, and distribution of controlled substances or the receipt and disposition of proceeds derived from the sale of illegal narcotics.

2.    Financial records and other documents reflecting narcotics-trafficking activity or the disposition of narcotics proceeds, including, but not limited to, financial instruments; stocks; bonds; bank checks; cashier's checks and receipts for such checks; Western Union receipts; money orders; money order receipts; credit card records; pre-paid credit cards; green dot cards; vehicle registrations; real estate records; income tax returns and any documentation relating to the payment of any income tax; mail and contract mail carrier records; documentation and receipts relating to any safe deposit boxes; keys to safe deposit boxes; documentation and receipts relating to any storage facilities; keys to those storage facilities; devices capable of counting large sums of currency; and any other documents or evidence of financial transactions involving the receipt and disposition of the proceeds of illegal narcotics sales.

3.    Records that identify other co-conspirators, including, but not limited to: address books; telephone books; rolodexes; telephone bills and records; records of telephone calls recorded in writing; notes reflecting telephone and pager numbers or papers which reflect names, addresses, and telephone numbers of suspected co-conspirators; photographs, including still photos, negatives, movies, slides, video tapes, and undeveloped film; and audiotape recordings of conversations, including those made over telephone answering machines.

4.    Records of travel including, but not limited to, tickets; transportation schedules; passports; automobile rental records; motel/hotel receipts; and any notes and other receipts related to travel.

5.    Indicia of occupancy, residency, rental, control, and/or ownership of the premises, including, but not limited to, keys; photographs; deeds; mortgages; lease agreements; rental receipts; canceled checks; bills; titles; and registration documents.

6.    Drug paraphernalia, including, but not limited to, digital scales; plastic bags; gel caps; vials; cutting agents (i.e. Mannitol and Quinine); metal pressing devices for compressing controlled substances; razors; kilogram wrappers; and other items used in the preparation and packaging of controlled substances.

7.      United States currency or currency equivalents.

8.      Suitcases; file cabinets; or other locked or unlocked containers; hidden compartments that may contain any of the items listed in Nos. 1 – 7; and the contents thereof.

9.      Locked or unlocked safes (and law enforcement officers may drill the same).

10.     Cellular telephones and related records; pagers and personal digital assistants and the numbers stored inside those devices; and devices capable of recording incoming telephone numbers and the numbers stored within those devices.

## Attachment A-3:  Target Location 3

The property to be searched is 2325 N. 39th Avenue, Phoenix, Arizona 85009 (hereinafter referred to as "**Target Location 3**").  **Target Location 3** is described as follows:  a single story western facing, brown painted block house with white trim and brown shingle roof.  The front entry door to the building is located at the center of the building and is an inward opening white panel door with an outward opening black metal security screen door, to the south of the front door is a large window facing west with painted metal bars affixed, and to the north of the front door is another smaller window facing west with painted metal bars affixed.  The number "2325" is affixed to the left (northern) porch column in the front of the building, facing west towards 39th Avenue.

Photographs of **Target Location 3** are as follows:



## Attachment B-3:  Items to be Seized From the Target Premises

This warrant authorizes the search and seizure of all records relating to the violations of 21 U.S.C. §§ 841, 843(b), and 846, by Antoine Anthony Alvarez and Millie Ann Reyes and their known and unknown co-conspirators, including, but not limited to, the following:

1.    Records of narcotics transactions, including, but not limited to, books; ledgers; receipts; notes; pay and owe sheets; and other papers relating to the manufacture, transportation, possession, and distribution of controlled substances or the receipt and disposition of proceeds derived from the sale of illegal narcotics.

2.    Financial records and other documents reflecting narcotics-trafficking activity or the disposition of narcotics proceeds, including, but not limited to, financial instruments; stocks; bonds; bank checks; cashier's checks and receipts for such checks; Western Union receipts; money orders; money order receipts; credit card records; pre-paid credit cards; green dot cards; vehicle registrations; real estate records; income tax returns and any documentation relating to the payment of any income tax; mail and contract mail carrier records; documentation and receipts relating to any safe deposit boxes; keys to safe deposit boxes; documentation and receipts relating to any storage facilities; keys to those storage facilities; devices capable of counting large sums of currency; and any other documents or evidence of financial transactions involving the receipt and disposition of the proceeds of illegal narcotics sales.

3.     Records that identify other co-conspirators, including, but not limited to: address books; telephone books; rolodexes; telephone bills and records; records of telephone calls recorded in writing; notes reflecting telephone and pager numbers or papers which reflect names, addresses, and telephone numbers of suspected co-conspirators; photographs, including still photos, negatives, movies, slides, video tapes, and undeveloped film; and audiotape recordings of conversations, including those made over telephone answering machines.

4.    Records of travel including, but not limited to, tickets; transportation schedules; passports; automobile rental records; motel/hotel receipts; and any notes and other receipts related to travel.

5.    Indicia of occupancy, residency, rental, control, and/or ownership of the premises, including, but not limited to, keys; photographs; deeds; mortgages; lease agreements; rental receipts; canceled checks; bills; titles; and registration documents.

6.    Drug paraphernalia, including, but not limited to, digital scales; plastic bags; gel caps; vials; cutting agents (i.e. Mannitol and Quinine); metal pressing devices for compressing controlled substances; razors; kilogram wrappers; and other items used in the preparation and packaging of controlled substances.

7.    United States currency or currency equivalents.

8.     Suitcases; file cabinets; or other locked or unlocked containers; hidden compartments that may contain any of the items listed in Nos. 1 – 7; and the contents thereof.

9.     Locked or unlocked safes (and law enforcement officers may drill the same).

10.     Cellular telephones and related records; pagers and personal digital assistants and the numbers stored inside those devices; and devices capable of recording incoming telephone numbers and the numbers stored within those devices.